JUDE G. GRAVOIS, Judge.
LDefendant/plaintiff-in-reconvention, Andy Cousin,[1] appeals an August 8, 2014 trial court judgment that dismissed his reconventional demand against plaintiff/defendant-in-reconvention, Carrier Corporation (“Carrier”). Originally, Carrier sued Mr. Cousin on an open account, alleging that it sold him airconditioning equipment for installation in his home under construction, and that he failed to pay the entirety of the amount due on the account. Mr. Cousin reconvened against Carrier, alleging that Carrier breached its contract with him by: 1) failing to honor an extended warranty that he allegedly purchased on the equipment; 2) failing to supply various items/services in connection with the controls contract he entered into with Carrier for operation of the equipment (namely, failing to provide energy recovery units and bypass dampers, and failing to provide coordination and training for the controls); and 3) refusing to accept the |3return of one of the air-conditioning units that was changed out before the units were activated.
Prior to trial, Carrier’s main demand was satisfied. After trial on the merits of Mr. Cousin’s reconventional demand, the trial court ruled in favor of Carrier, finding that Mr. Cousin failed to prove that he purchased an extended warranty on the Carrier air-conditioning units, that Carrier did not breach the controls contract, and that Carrier was not liable to Mr. Cousin for the return and refund of one of the 15-ton air-conditioning units installed in the home.
On appeal, Mr. Cousin seeks reversal of the' trial court’s judgment and a ruling from this Court finding that: 1) he purchased an extended warranty froip Carrier, thereby entitling him to $23,339.92 from Carrier for repairs made to the air-conditioning units during the extended warranty period; 2) Carrier breached the controls contract, thereby entitling him to an $8,000.00 refund from Carrier; and 3) he is entitled to a refund of the $2,399.00 purchase price of one of the 5-ton air-conditioning units installed at his home that Carrier refused to accept the return of.
Carrier answered the appeal, asserting that Mr. Cousin’s appeal is frivolous, and seeking damages therefor.
For the following reasons, we affirm the trial court’s judgment, finding no manifest error in the trial court’s findings of fact and conclusion that Mr. Cousin failed to bear his burden of proof ori all claims made in his reconventional demand. Further, we decline to award Carrier damages for a frivolous appeal.

FACTS

In 2001, Mr. Cousin entered into a contract with Natal’s Air Conditioning (“Natal’s”) for the selection and installation of central air-conditioning equipment for his home under construction at 2908 Palm Vista in Kenner, Louisiana. Donnie Natal of *1171 Natal’s, working with Carrier, selected 11 Carrier 5-ton air-conditioning |4units for use in the home, and in due course, Natal’s installed the 5-ton units in Mr. Cousin’s home under construction. The units were soldered into place, though testimony indicated that they were never “started up” due to problems in the installation that were revealed when the systems were checked for readiness in 2002. In February or March of 2002, Mr. Cousin fired Natal’s from the job before the entire contract between them was performed, allegedly due to poor workmanship and inadequate supervision by Natal’s.
Mr. Cousin then hired Flettrich Services (“Flettrich”) to complete the air-conditioning installation work. Harold Flettrich, president and owner of Flettrich, testified at trial that when he checked the system installed by Natal’s for Mr. Cousin in 2002, prior to attempting to start the units up, he discovered that the wrong size copper tubing had been installed, and that there were numerous leaks in the refrigerant lines due to shoddy workmanship in the installations, as well as other problems, including a lack of pressure, that prevented the system from functioning properly. Mr. Flettrich, who testified for Mr. Cousin at trial, also determined that the 5-ton units were too large for the needs of the home. He recommended that they be removed and replaced with 3-ton units instead, which was done following a meeting between Mr. Cousin, Mr. Flettrich, unnamed Carrier representatives, and Max Kepler, Mr. Cousin’s builder.
According to Mr. Cousin, the 5-ton units were uninstalled or disconnected and removed from the home and stored in a warehouse. Carrier later refused to accept return of the 5-ton units, after allegedly initially advising Mr. Cousin at the aforementioned meeting that Mr. Cousin could return them and get a refund therefor, minus a small restocking fee. Mr. Cousin testified that he gave away or sold ten of the .11 5-ton units, thus partially mitigating his damages, leaving one unit for which he now seeks return and reimbursement from Carrier.
|fiAlso in 2001, Mr. Cousin entered into a separate contract with Carrier for the controls for the air-conditioning equipment. This contract provided for a programmable system with software, working with an interface by Crestron (a company not affiliated with Carrier), that would provide coordinated temperature control for the 11 units. Mr. Cousin argues that although he paid the controls contract in full, Carrier failed to fulfill several of the line items of the contract, specifically that Carrier failed to provide energy recovery units, bypass dampers, and coordination and training with Crestron, entitling him to a refund of $8,000.00 from the price of the controls contract.
According to testimony adduced at trial, Mr. Cousin moved into the home sometime in 2004. He testified that the air-conditioning system has broken down numerous times between then and the 2014 trial date, necessitating well over $38,000.00 in service, although a portion thereof was for regular maintenance of the system. He seeks reimbursement in the amount of $23,339.92[2] for repair' expenses that he claims should be' covered under the extended warranty he allegedly purchased from Carrier.

STANDARD OF REVIEW

In a civil* case, Louisiana courts require the plaintiff to fulfill his or her *1172 burden to prove a prima facie case. In ordinary civil actions, the plaintiff, in general, has the burden of proof and must prove the facts at issue by a preponderance of the evidence. Proof by a preponderance of the evidence is defined as taking the evidence as a whole, the fact to be proved is more probable than not. Crescent City Motors, L.L.C. v. Rafidi, 10-609 (La.App. 5 Cir. 12/14/10), 54 So.3d 1170, 1171.
| fiIt is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Where there is conflict in the testimony, reasonable evaluations of credibility, and reasonable .inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Id.
ANALYSIS OF ASSIGNMENTS OF ERROR[3]

Extended wairanty claims

Mr. Cousin argues on appeal that the trial court erred in concluding that he failed to prove that he purchased an extended warranty on the Carrier aircondi-tioning equipment in question, and thus erred in denying his extended warranty claims. He argues that the documentary evidence, consisting of quotations, invoices, and a copy of a check written by Max Kepler, his builder, to Natal’s for $52,110.72, proved that he purchased an extended warranty on the subject equipment. Mr. Cousin also argues that because the documentary evidence shows that he purchased the extended warranty from Carrier, Carrier’s failure to 17recognize this purchase means that Carrier overcharged him $5,082.00 for the equipment, and thus Carrier committed fraud against him.
Mr. Cousin also argues that the trial court was manifestly erroneous in relying upon the testimony of Mr. Natal, the fired and impeached contractor whose testimony — that Mr. Cousin wanted to wait to purchase the extended warranty at a later date — .was motivated by ill will. Mr. Cousin contends that the trial court ignored his own testimonial evidence that the extended warranty purchased for the original 5-ton units through Natal’s reverted to the 3-ton units purchased from and installed by Flettrich.
Mr. Cousin also argues that Carrier failed to inform him of the “suspensive *1173 condition” of its requirement that the contractor submit an extended warranty card to Carrier before an invoice could be issued for the extended warranty. He argues that this “unknown suspensive condition went unfulfilled due to the fault of Carrier in not informing [Mr.] Cousin of this condition thereby making [Carrier] liable for the repairs to the Carrier HVAC equipment covered by the Carrier extended warranty.”
In its reasons for judgment, however, the trial court made clear that it found evidence lacking that Mr. Cousin actually purchased the extended warranty on the air-conditioning equipment from Carrier. At trial, Mr. Cousin testified that it was his intention to purchase an extended ten-year warranty on parts and labor, and that he believed he had paid for such warranty. In support of his testimony, he introduced documentary evidence consisting of quotations for the equipment from Carrier.
Exhibits 1A and IB, both dated July 1, 2001, are two quotations from Carrier to Natal’s for Mr. Cousin’s air-conditioning job. Both quotations included two line items pertaining to extended warranties ($4,400.00 for ten years for parts Rand labor on the 11 5-ton air-conditioning units, and $340.00 for “5 YR PATS & 10 YR COMP FOR DUCTLESS SPLIT” [sic]).[4] The quotation for all of the line items contained in Exhibit IB, added together, but excepting therefrom the quotations for the two warranty items noted above, totals $47,808.00. Adding 9% sales taxes to that total ($4,302.72)[5] results in a total quoted amount of $52,110.72.
Exhibit 2 is a copy of a check written by Mr. Cousin’s builder, Max Kepler of Max and Associates, Inc., dated November 8, 2001, payable to “Carrier/Natal Air Conditioning, Inc.” for $52,110.72, with “Carrier Equipment Cousin Residence” written in the memo section of the check. The amount of this check corresponds exactly to the amount quoted in Exhibit IB (minus the two warranty items), including applicable sales taxes. Upon review, we find that the amount quoted in Exhibit IB, including applicable sales taxes, combined with the check from Mr. Kepler to Carrier/Natal’s for the exact amount quoted, including applicable sales taxes, clearly indicates that this payment did not include payment for the extended warranty items included in the quotation.
Although several quotations from Carrier to Natal’s were introduced into evidence, Mr. Cousin did not introduce any other documentary evidence showing invoicing or payment for any extended warranties.[6]
*1174 |9Mr. Cousin testified that he discussed and approved all equipment, warranties, and orders with Mr. Kepler, his builder, but that Mr. Kepler paid all of the subcontractors and suppliers himself, without his direct involvement in that task. Thus, he had no independent básis to know why Mr. Kepler wrote a check to Carrier/Natal’s for the specific amount noted above ($52,-110.72). It'is noteworthy that Mr. Cousin did not call Mr. Kepler as a witness at trial.
Mr. Flettrich testified that he has sold Carrier equipment for over 50 years, and was familiar with Carrier’s procedures for purchasing extended warranties for equipment and labor. He explained that the one-year factory warranty on all equipment is included in the purchase price of the equipment and that no further steps are required to initiate that warranty. He said that in his experience, there are two ways to purchase an extended warranty from Carrier. First, it can be purchased at the same time the equipment is purchased, which was his normal practice, because then the warranty and the equipment are on the same invoice. He also said that the homeowner can purchase the warranty separately at the end of the job. He testified that he was not involved with Mr. Cousin’s contract with Natal’s and had no knowledge of whether and/or when Mr. Cousin purchased an extended warranty through Natal’s. He testified that Mr. Cousin never asked him to purchase an extended warranty on the Carrier equipment; he assumed Mr. Cousin had already purchased an extended warranty on the equipment.
Mr. Flettrich testified that in order for Carrier to honor an extended warranty, the contractor must register the equipment with Carrier, which involves the contractor sending the paperwork in on the warranty (a warranty card) to Carrier. He testified that he normally keeps copies of all paperwork submitted to Carrier for warranty registration, as well as copies of the warranty certificates. He also explained that to his knowledge, extended warranties with Carrier pertain to Imspecific pieces of registered equipment and are not transferable to other pieces of equipment. Mr. Flettrich said that it would have been Natal’s responsibility to register the 5-ton units for the extended warranty, but Natal’s could not have done that until after the start-up date, because the extended warranty’s effective date would have been the start-up date. He opined that Natal’s probably did not register the equipment for the extended warranty, if such was purchased, because Natal’s had been fired from the job before the start-up date and therefore would not have had that information to supply to Carrier. However, he admitted that he had no knowledge of what Natal’s had done or not done regarding the extended warranty.
Debbie Zito, an inside sales representative with Carrier, testified regarding the extended warranty registration procedures. Her testimony agreed substantially with Mr. Flettrich’s testimony regarding these procedures. She clarified that in the case of an extended warranty, the contractor must fill out the warranty card first and send it in, and an invoice is then *1175 created for it. She agreed that a contractor could quote an extended warranty to a customer and bill the customer for it, but Carrier is not paid until the return of the extended warranty card generates an invoice to the contractor. She testified that she searched the Carrier computer registration system and could find neither invoices for extended warranties on Mr. Cousin’s Carrier equipment, nor any evidence that an extended warranty was activated on his equipment.
Ken Breaux, a quality assurance manager at Carrier, testified that he had experience with Carrier’s requirements to generate an extended warranty. He agreed that it was possible for a customer to pay a contractor for an extended warranty, but that such warranty would not be effective until the contractor sent in the warranty card to Carrier.
InDonnie Natal of Natal’s testified that he had been in the air-conditioning business for 40 years doing commercial, residential, and industrial air-conditioning, which included estimates, sales, and installation. He said that he was a dealer for Carrier. He explained that he was contacted in 2001 by Max Kepler, a general contractor, who was building Mr. Cousin’s home. At first, he was asked to quote only installation and duct work, as the equipment was to be supplied first by York, and then by Trane. Later, he was asked to also quote Carrier equipment.[7] He recommended Carrier equipment after a meeting with Ken Fisher, a Carrier representative. He testified that he recommended 5-ton units, and that Mr. Cousin met with Carrier representatives thereafter who reviewed Mr. Cousin’s home and calculated the amount and type of equipment to be used. He said he did not take part in those calculations, and that only some of his recommendations were used.
Mr. Natal reviewed Exhibit 17 and agreed that he recommended the extended warranty to Mr. Cousin, which was priced at $31,005.00. He could not explain the discrepancies in the prices listed in the two quotations, Exhibits 1A and IB, but claimed the totals therein were only a couple of hundred dollars apart, which was not significant given the job. He stated that Mr. Cousin fired him from the job after the units were already running.[8]
On cross-examination, Mr. Natal said that in 2001, when Mr. Cousin hired him, he was a certified Carrier dealer and he was very familiar with the requirements for an extended warranty. He agreed that the extended warranty applied to specific registered equipment and was not transferable to other equipment, and if purchased for the 5-ton equipment, would not have transferred to 112the 3-ton units Flettrich purchased. He said that Mr. Cousin told him he did not want to purchase the extended warranty from Carrier until the equipment was up and running. Mr. Natal testified that Mr. Cousin never purchased an extended warranty on the equipment from him.
Mr. Cousin testified in rebuttal to Mr. Natal’s testimony. He disagreed with Mr. Natal’s position that he declined to purchase the extended warranty until the units were started up. He testified he believed that he had paid for the extended *1176 warranty with the check from Max Kepler to Carrier/Natal’s for $52,110.72.
After considering the totality of the evidence presented on this issue, we find no manifest error in the trial court’s conclusion that Mr. Cousin failed to prove that he actually purchased an extended warranty on the Carrier equipment. The one check in evidence that refers to “Carrier Equipment” and no warranties, is written for an amount identical to the information contained in Exhibit IB, which totals the equipment and sales taxes, excluding the warranty charges. At least one other exhibit, Exhibit 17, appears to price the ten-year extended warranty at $31,005.00, for which no payment evidence was introduced.
Further, we find no merit to Mr. Cousin’s assertion that the trial court ignored his testimony that the extended warranty he purchased on the 5-ton units reverted to the 3-ton units ultimately installed in his home. First, as noted above, Mr. Cousin failed to prove that he purchased the extended warranty on the 5-ton units. Second, Mr. Cousin’s self-serving testimony was the only evidence to support his contention that equipment warranties were transferable from one piece of equipment to another. Mr. Flettrich, Mr. Cousin’s own witness, specifically testified that in his experience with Carrier, warranties, both factory and extended, were specific to each piece of equipment and were not transferable. Carrier’s witnesses and Mr. Natal testified to this as well.
11sMr. Cousin’s argument regarding a suspensive condition is misplaced. Both of the contractors (Flettrich, Natal’s) testified that they were aware of Carrier’s requirement that the warranty card must be returned before an extended warranty could be honored. Carrier’s representatives testified that Carrier did not receive the warranty card on Mr. Cousin’s equipment from any contractor involved in this job. The condition precedent to the warranty card being sent in was for the customer, in this case Mr. Cousin, to pay for the extended warranty. Mr. Cousin failed to provide evidence that he in fact paid a contractor, Natal’s or Flettrich, or Carrier itself directly, for an extended warranty. Had Mr. Cousin borne his burden of proof that he paid for the warranty as he claimed, he might have a cause of action against the contractor who accepted payment for the warranty and then failed to complete the transaction by failing to send the warranty card(s) in to Carrier. However, given the lack of evidence that Mr. Cousin paid anyone for an extended warranty, we find no manifest error in the trial court’s finding that Carrier is not liable to Mr. Cousin for any extended warranty claims.
Mr. Cousin’s final argument on his warranty claims is that because the documentary evidence shows that he purchased the extended warranty from Carrier, Carrier’s failure to recognize this purchase means that Carrier overcharged him $5,082.00 for the equipment, and thus Carrier committed fraud against him. The trial court did not address Mr. Cousin’s claim that he was defrauded by Carrier, thereby denying the same by implication. It appears that Mr. Cousin did not make any claim of fraud against Carrier until he filed his post-trial memorandum. “In pleading fraud or mistake, the circumstances constituting fraud or mistake shall be alleged with particularity.” La. C.C.P. art. 856. Because Mr. Cousin did not allege fraud until the filing of his post-trial memorandum, we find that the trial court properly ignored this claim. See, Hawkins v. Willow, Inc., 12-160 (La.App. 5 Cir. 10/16/12), 102 So.3d 900, 903, and Goines v. Goines, 09-994 (La.App. 5 Cir. 3/9/11), 62 So.3d 193, 199.

*1177
Controls contract claims

Mr. Cousin next argues that the trial court erred in finding that Carrier did not breach the controls contract and thus erred in denying his claims therefor. He argues that he paid for the controls contract in full, but that Carrier failed to fulfill several of the 14 line items contained therein, entitling him to a partial refund of the contract price in the amount of $8,000.00. He contends that Carrier failed to provide certain controls as it agreed to do under the contract (which included two energy recovery units and ten bypass dampers), failed to provide programming of the Carrier controls that were necessary to be able to operate the equipment using controls, and failed to provide a training session to Mr. Cousin to operate the system. Mr. Cousin argues that the evidence at trial is undisputed that these items of the contract were never fulfilled by Carrier.
Jeff Meariman of Carrier testified regarding the controls contract. He explained that he was familiar with the contract and was aware that Carrier was doing controls work at Mr. Cousin’s residence. He stated that energy recovery units were not part of the controls sequence; the controls contract called for installing controls for them had they been installed in the home, but they were not installed.
He also explained that programming for Carrier controls was performed through the Crestron system and could also be performed with zone sensors and system interface of each comfort zone controller. He said that the controls contract called for coordination between Crestron and Carrier, and that Carrier called Crestron numerous times in order to coordinate programming for this piece of the controls contract, but that it was the owner’s (Mr. Cousin’s) responsibility to have 11fiCrestron on site, and that the owner did not do so. He explained that Crestron was never under contract to Carrier. He admitted that his subordinate, a Mr. Berger, was the Carrier representative who dealt with Crestron and that his knowledge of the matter came from Mr. Berger.
On cross-examination, Mr. Meariman opined that the cost of the bypass dampers appeared to be included in the controls contract. He explained, on redirect, that he had no part in the drafting of the controls contract, did not sign it, and had no direct knowledge of the specifics of the controls or the controls contract scope of work, and had no.knowledge of the parties’ intent regarding any of the controls of this project.
With regard to the bypass dampers, the controls contract scope of work stated that bypass dampers would be provided “if necessary.” According to the testimony of Mr. Meariman, the system that was installed by Natal’s did not require bypass dampers. Mr. Flettrich testified that Natal’s was responsible for installing bypass dampers, if necessary, not Carrier.
Thus, Mr. Cousin’s evidence falls short of proving that Carrier breached the controls contract. While Mr. Cousin claimed that Carrier failed to provide bypass dampers, energy recovery units, and coordinate the programming with Crestron, the other witnesses’ testimonies claimed that it was uncertain if the bypass dampers and energy recovery units were part of the controls contract scope of work, and if so, claimed that they were to be ordered and installed by the contractor, not by Carrier as part of the controls contract. Likewise, Mr. Meariman testified that Carrier had no contract with Crestron and it was Mr. Cousin’s responsibility to arrange for Crestron to coordinate with Carrier, something he said Carrier actually tried to do without success. Further, as the trial court noted in its reasons for judgment, *1178 Mr. Cousin admitted that he had not contacted Crestron in an | ^effort to establish the connection, and he was unaware of Carrier’s actions in this regard. As noted above, when findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Rosell v. ESCO, 'supra, at 844. Accordingly, we find no manifest error in the trial court’s denial of Mr. Cousin’s controls contract claims.

Claim for return and refund of one of the CaiTier units

With respect to his final claim against Carrier, Mr. Cousin argues that the trial court erred in failing to find that Carrier is responsible for damages arising from the recommendation of the wrong (5-ton) HVAC units, which required him to replace the units with ten 3-ton units. Accordingly, he argues that Carrier breached their agreement to accept return of the 5-ton units, and that Carrier should be cast in judgment for the cost of the remaining unit ($2,399.00 plus sales taxes) he was unable to dispose of.
Ms. Zito testified that Carrier’s return policy was “new and unused within 30 days returned.” She said that this policy does not allow the return of equipment that has been soldered and installed. Ken Breaux, a Carrier employee and manager for over 20 years, testified similarly. As a manager, he was not aware of any instance where a manager could override this Carrier policy and allow the return of units that had been soldered into place.
Mr. Cousin testified that at the aforementioned meeting in 2002 with unnamed Carrier representatives, himself, Mr. Flettrich, and Mr. Kepler, Carrier representatives told him that he could return the 5-ton units. However, at trial, Mr. Cousin was unable to identify any of the Carrier representatives who allegedly made this return agreement, nor was he able to produce any documentary evidence | ,7of the same.[9] Accordingly, we find no manifest error in the trial court’s conclusion that Mr. Cousin failed to bear his burden of proof that Carrier had agreed to accept return of the 5-ton units after they had been installed in his home.

CARRIER’S ANSWER TO THE APPEAL

In its Answer to this appeal, Carrier asserts that Mr. Cousin’s appeal is frivolous, thereby entitling Carrier to damages against Mr. Cousin, including reasonable attorney’s fees and costs incurred in defense of the appeal, pursuant to La. C.C.P. art. 2164 and Uniform Rules, Courts of Appeal, Rule 2-19. Upon review, we do not find Mr. Cousin’s appeal to be frivolous, and accordingly decline to award damages to Carrier for a frivolous appeal.

CONCLUSION

For the foregoing reasons, we find no manifest error in the trial court’s findings of fact and conclusion that Mr. Cousin failed to bear his burden of proof regarding the claims made in his reconventional demand, and thus affirm the trial court’s judgment dismissing Mr. Cousin’s recon-ventional demand. Further, we decline to award Carrier damages for a frivolous appeal. However, costs of the appeal are assessed to appellant.

AFFIRMED

. Defendant/plaintiff-in-reconvention’s last name is stated in the record as being either "Cousin” or "Cousins”: For accuracy and consistency, we will use the last name "Cousin” in this opinion when referring to defendant/plaintiff-in-reconvention, as that appears from the record to be his correct last name.

. Prior to trial, the parties stipulated that if the trial court found that Mr.' Cousin had indeed purchased an extended warranty from Carrier on the air-conditioning equipment in question, then the total amount of payment due for repairs to the Carrier equipment under the extended warranty would be this amount.

. On appeal, Mr. Cousin asserts six assignments of error: 1) Carrier breached the controls contract; 2) Carrier failed to inform Mr. Cousin of a suspensive condition concerning the extended warranty purchase; 3) Carrier committed fraud in overcharging Mr. Cousin for the equipment purchased; 4) the trial court erred in relying on the testimony of Mr. Natal on the issue of Mr. Cousin’s purchase of the extended warranty; 5) the extended warranty purchased reverted from the 5-ton units to the 3-ton units; and 6) Carrier failed to accept return and refund of one of the 5-ton units. Four of Mr. Cousin’s assignments (Nos. 2, 3, 4 and 5) relate to his claim that he allegedly purchased an extended warranty from Carrier on the air-conditioning equipment in question; one of his assignments (No. 1) relates to his claims on the controls contract he purchased from Camer; and his final assignment (No. 6) relates to his claim for the return and refund of one of the 5-ton units purchased from Carrier. For convenience and ease of understanding, we address Mr. Cousin’s assignments in terms of the three separate claims made against Carrier (extended warranty claims, controls contract claims, and claim for return and reimbursement of one of the 5-ton units), rather than the individual assignments asserted.

.Two handwritten notations appear on Exhibit IB, apparently on "sticky notes” that were attached to the original document, taking out the two warranty line items with the notation "pay later.” During trial, counsel stipulated to the admissibility of Exhibit IB without the "sticky notes.” The exhibit contained in the record, which is a copy, clearly contains the "sticky note” information, although we did not consider the information contained on the "sticky notes” in formulating our findings herein.
It is further noted that some of the line item quotations contained in these two exhibits are not identical. Exhibit IB quotes higher prices for some of the items; however, the prices quoted for the two warranty items are the same in both exhibits.

. Sales taxes were calculated at 9%, the combined state and local sales tax rate in New Orleans. The invoices list Carrier’s address in New Orleans. Natal’s address was in New Orleans as well.-

. Exhibit 17 is a letter from Natal’s to Mr. Cousin dated June 29, 2001, listing "Carrier Equipment model and serial.” It is dated two days before the quotations found in Exhibits 1A and IB. This letter appears to price the listed equipment at $104,291.00. The last item on the list is a ten-year warranty on parts and labor, which appears to be priced at *1174 $31,005.00. This document merely lists equipment and two total prices (one for equipment, one for the warranty); it contains no language stating that such was ordered or paid for. No evidence of payment corresponding to this exhibit was introduced into evidence.
An examination of Exhibit 14, which included all of the invoices in evidence, fails to show any invoice that included any extended warranty. The invoices contained in Exhibit 14 total $56,511.41, which does not appear to match either of the quotations in Exhibits 1A or IB.

. Mr. Natal explained that the Trane contract was canceled because the Trane equipment that was delivered' to the home required three-phrase power, which was not available at the home.

. Mr. Natal originally claimed that he was kept on the job as a consultant to Mr. Flett-rich, but after reviewing Mr. Cousin’s letter to him terminating their relationship, he agreed he had been fired.

. In his post-trial brief, Mr. Cousin claims that Carrier employee James Fisher was the one who recommended the 5-ton units ordered and installed by Natal’s in 2001. However, at trial, Mr. Cousin could not identify the name of the Carrier representative who allegedly agreed to accept the return of the 5-ton units in 2002.