STATE OF LOUISIANA

VERSUS

MALCOLM J. ALEXANDER

NO. 22-CA-12

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 80-1260, DIVISION "F"
HONORABLE MICHAEL P. MENTZ, JUDGE PRESIDING

June 21, 2023

**ROBERT A. CHAISSON**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, Robert A. Chaisson, John J. Molaison, Jr., and Cornelius E. Regan, Pro
Tempore

**REVERSED AND REMANDED**
    **RAC**
    **FHW**
    **MEJ**
    **CER**

**DISSENTS WITH REASONS**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Susan S. Buchholz
Chief Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Jeffrey M. Landry
    Christopher N. Walters
    Grant L. Willis

COUNSEL FOR DEFENDANT/APPELLANT,
MALCOLM ALEXANDER
    Zachary T. Crawford
    Jee Y. Park

**CHAISSON, J.**

In this case brought by Malcolm Alexander seeking compensation for wrongful conviction and imprisonment pursuant to La. R.S. 15:572.8, Mr. Alexander appeals a July 12, 2021 judgment of the trial court denying and dismissing with prejudice his petition. For the following reasons, we reverse the judgment of the trial court and remand the matter with instructions to the trial court to calculate the amount of compensation to be awarded to Mr. Alexander in accordance with the provisions of La. R.S. 15:572.8.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Sometime around 11:30 a.m. on November 8, 1979, B.N., a 39-year-old white female, was sitting alone in the front room of her newly renovated antique store at 363 Whitney Avenue in Gretna, when an unknown black man rode up to the shop on a ten speed bicycle, entered the store, and inquired about purchasing a coffee table. B.N., who had risen to greet him, turned to lead him to the back of the store where the merchandise was located when the man grabbed her from behind. When she struggled to get away, the man struck her in the back of the head with a small handgun and demanded money. When B.N. explained she did not have any money, the man took her to the bathroom at the back of the shop where he forced her at gunpoint to strip and get face down on the floor where he vaginally penetrated her from behind. The rape was interrupted by a phone call, which the perpetrator forced B.N. to answer. After hanging up, the perpetrator forced B.N. back to the bathroom where she was raped again. After the rape, the perpetrator placed machinery and objects in front of the bathroom door and proceeded to escape. Because the bathroom door opened from the inside, B.N. was able to escape. She immediately called her ex-husband at approximately 11:45 a.m., and they then called the police.

Police officers were immediately dispatched to the scene, and an initial description of the perpetrator was broadcast to units in the area who began a systematic search. The perpetrator was initially described as a black male, twenty to twenty-four years old, six feet tall, 165 to 170 pounds, with a slight beard, neat appearance, wearing a navy watch hat, a black windbreaker with an emblem on the left breast, blue jeans, and riding a yellow or orange ten speed bicycle. The first officer on the scene, Deputy Ralph Peperone, who arrived at approximately 12:15 p.m., confirmed this initial description of the perpetrator with B.N. Within the first ten minutes of Deputy Peperone's arrival at the scene, assisting officers brought to the scene a man matching the description of the suspect that they had apprehended riding a ten speed bicycle at the intersection of Whitney Avenue and Stumpf Boulevard. The man was black, about 170 pounds, six feet tall, clean shaven with short hair, dressed in jeans with the fly down, and a black windbreaker, but had no navy watch cap or gun. B.N., standing more than twenty feet away and looking through tinted and bar covered windows, did not positively identify this man as the perpetrator.[1] Because B.N. was unable to make an identification of this individual, he was released.

Later that afternoon, B.N. was taken to the hospital by police detectives where she was examined by a physician and samples were collected for the rape kit, including vaginal swabs, pubic hairs, head hairs, blood, saliva, fingernail debris, as well as her clothing. This evidence, as well as evidence collected from the crime scene consisting of a white hand towel used by B.N. to clean herself after the assault and hairs collected from the floor of the bathroom were given to the Jefferson Parish Crime Lab. Following the medical examination, detectives took

---

[1] Though stated in written police reports from the day of the assault, in her 2019 statement, B.N. stated that she had no recollection whatsoever of being shown this individual.

B.N.'s statement and created a composite sketch of the perpetrator based on her description.

Over the course of the next few months B.N. was shown hundreds of photographs of potential perpetrators, but never saw anyone that resembled the perpetrator. A few weeks after the occurrence, B.N. called the investigating officer, Detective O'Neil Denoux, claiming that she had seen a man from a distance working at a car dealership whom she believed could be the perpetrator. When subsequently shown a photo of this man, she did not identify him as the perpetrator.

A few months later, on March 24, 1980, approximately four and one-half months after the rape, Detective Denoux contacted B.N. and asked her to come to the station to view a photograph of a potential suspect. Detective Denoux showed B.N. an array of five color photographs from which B.N. identified Malcolm Alexander as a "possible" rather than "positive" perpetrator, and wrote "TENATIVE" [sic]. Days later on March 27, B.N. positively identified Mr. Alexander as the perpetrator in a live line-up.[2] Approximately seven months later, and a year after the occurrence, B.N. positively identified Mr. Alexander as the perpetrator at the one-day, November 5, 1980 trial. Officers Denoux and Peperone also testified at the trial, as well as the technician responsible for photographing and collecting specimens from the crime scene and the physician who conducted the medical evaluation. At the conclusion of the trial, the jury returned a unanimous verdict finding Mr. Alexander guilty of aggravated rape.

Shortly after the trial, Mr. Alexander was sentenced to life imprisonment without the possibility of parole. The only evidence connecting Mr. Alexander to the crime was the eyewitness testimony of the victim, B.N. Physical evidence

---

[2] Notably at that time, Mr. Alexander was nineteen and five-feet nine inches tall, both younger and shorter than the perpetrator described by B.N. on the day of the incident.

collected at the scene of the crime, including hairs, a towel with seminal fluid, and samples from a rape kit, were not comparatively tested with samples taken from Mr. Alexander or any other suspect prior to the trial.

Since his conviction, and going back as far as 1982, Mr. Alexander has consistently argued that testing of this physical evidence would have conclusively and scientifically proven his innocence and that his trial was prejudiced by the ineffective assistance of his counsel, Mr. Joseph Tosh. This ineffective assistance of counsel claim included failure during the course of the trial to object to the introduction of hearsay testimony and other failures to challenge evidence presented by the prosecution, as well as Mr. Tosh's failure to file any pre-trial motions that would have entitled him to discovery and testing of the State's evidence.[3] With the exception of some hairs collected from the crime scene, all of this potentially exculpatory evidence from the investigation was destroyed on June 18, 1984, at the direction of the Jefferson Parish Clerk of Court's Office.

In 1999, Mr. Tosh, the attorney who represented Mr. Alexander, after formal disciplinary charges were brought against him consisting of sixty-three formal counts and an additional twenty to thirty complaints, was disbarred from practicing law for engaging in knowing and intentional misconduct and breaching duties owed to his clients, the legal system, the profession, and the public.[4] *In re Tosh*, 99-1972 (La. 9/3/99), 743 So.2d 197.

In 2015, twelve hair samples collected from the scene of the crime were discovered at the Jefferson Parish Crime Lab.[5] In 2016, pursuant to a stipulated joint order for post-conviction DNA testing, the three black pubic hairs recovered from the scene were tested and the mitochondrial DNA profiles compared with that

---

[3] This argument was made by Mr. Alexander as early as January 11, 1982, in his brief filed in federal post-conviction proceedings. *See Alexander v. Butler*, 89-4764 (E.D. La. 8/28/90) 1990 WL 127949.
[4] None of these complaints related to Mr. Alexander's case.
[5] Of the twelve specimens found, six were identified as Caucasoid, one as a Negroid head hair, three as Negroid pubic hairs, and two as synthetic carpet fibers.

of Mr. Alexander. The test results showed that Mr. Alexander was excluded as the contributor of the three pubic hairs.[6]

On November 20, 2017, Mr. Alexander filed an Application for Post-Conviction Relief alleging again that Mr. Tosh failed to provide him with effective assistance of counsel and that DNA testing of the hairs from the scene conclusively proved his innocence. At the hearing on this application, the State admitted that Mr. Alexander had received ineffective assistance of counsel from Mr. Tosh. On January 30, 2018, the district court ordered that Mr. Alexander's conviction be vacated and that he be released from custody because he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, counsel's conduct is actually ineffective when it so undermines the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id*. at 686.

On August 19, 2019, Mr. Alexander filed the instant Petition for Compensation for Wrongful Conviction and Imprisonment Pursuant to La. R.S. 15:572.8, in which he argued that he satisfies the criteria set forth in the statute for compensation, to wit: 1) that his conviction has been reversed or vacated; and 2) that he has proved by clear and convincing scientific or other evidence that he is factually innocent of the crime for which he was convicted. In support of this second criterion, Mr. Alexander argues that DNA testing of the hairs left at the scene of the rape for which he was convicted, which, according to B.N., must have been left by the perpetrator, shows that he is factually innocent of the crime.

The trial court heard the petition on April 20, 2021, at which time the court was presented with the following evidence: a copy of the order vacating Mr. Alexander's conviction; the transcript of the November 5, 1980 trial; the entire

---

[6] The test results also indicated that the mDNA profiles of the pubic hairs shared a common base at every compared position and therefore likely originated from the same person or maternally related individuals.

Jefferson Parish Sheriff's Office investigative file including officer reports, victim statement, photos, and a composite sketch; reports of forensic DNA testing of three pubic hairs found at the crime scene; and transcripts of recorded telephone conversations between the victim, B.N., representatives of the Jefferson Parish District Attorney's Office from 2017, and representatives of the Attorney General's Office from 2019. Dr. Nancy Franklin was accepted by joint stipulation with the State as an expert in the field of "eyewitness identification and memory," and allowed to testify as such at the compensation trial.[7] Her expert report was not admitted, but proffered.

Mr. Alexander argued that he is factually innocent of the crime because the evidence of DNA test results of pubic hairs found at the scene of the crime show that the pubic hairs found in the bathroom where the rape occurred are not his. Additionally, Mr. Alexander argued that Dr. Franklin's testimony provided more than a dozen science-based factors which may rationally explain an erroneous identification by B.N. of Mr. Alexander as the perpetrator of the crime.

In support of its argument that Mr. Alexander had not met his evidentiary burden under La. R.S. 15:572.8, the State relied on the record and facts from Mr. Alexander's trial, including B.N.'s positive identification of Mr. Alexander as the man who attacked and raped her, as well as statements made by B.N. during the course of telephone interviews in 2017 and 2019 wherein she continued to identify Mr. Alexander as the perpetrator. The State also argued that Mr. Alexander failed to meet his evidentiary burden because the single black head hair collected from the crime scene that was not tested could potentially show that Mr. Alexander was in fact the perpetrator.

On July 12, 2021, the trial court, upon finding that Mr. Alexander had not met his burden of clear and convincing proof of his factual innocence, rendered

_____

[7] Dr. Franklin has her PhD in the field of Cognitive Psychology.

judgment in favor of the State and dismissed the petition with prejudice. Mr. Alexander's timely appeal followed.

On appeal, Mr. Alexander argues that the trial court legally erred in applying an erroneous higher legal standard for factual innocence than the standard set forth in La. R.S. 15:572.8, and that the trial court manifestly erred in its weighing of the new, and uncontroverted, evidence presented by him.

## DISCUSSION

*Standard of review*

In Mr. Alexander's assignments of error, he maintains that the trial court committed legal error when it applied a standard of proof for factual innocence that is not contained in La. R.S. 15:572.8. Legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial; that is, when they materially affect the outcome and deprive a party of substantial rights. *State ex rel. L.R.S.*, 38,812 (La. App. 2 Cir. 6/23/04), 877 So.2d 1040, 1046 (*citing Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So.2d 731). When legal error interdicts the fact-finding process, the trial court's findings of fact are given no special weight, and, if the record is otherwise complete, the appellate court conducts its own independent *de novo* review of the record. *Id.*; *Anderson v. Dean*, 22-233 (La. App. 5 Cir. 7/25/22), 346 So.3d 356, 364. Because the standard for factual innocence applicable to the evidence necessary to satisfy a petitioner's burden of proof under La. R.S. 15:572.8 is a question of law, our standard of review as to this assignment of error is *de novo*.

*Louisiana Revised Statute 15:572.8*

La. R.S. 15:572.8 states, in relevant parts:

§ 572.8. Compensation for wrongful conviction and imprisonment; petition process; compensation; proof; assignment of powers and duties

A. A petitioner is entitled to compensation in accordance with this Section if he has served in whole or in part a sentence of

imprisonment under the laws of this state for a crime for which he was convicted and:

    (1) The conviction of the petitioner has been reversed or vacated; and

    (2) The petitioner has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted.

B. For the purposes of this Section, "factual innocence" means that the petitioner did not commit the crime for which he was convicted and incarcerated nor did he commit any crime based upon the same set of facts used in his original conviction.

C. All petitions for compensation as provided in this Section shall be filed in the district court in which the original conviction was obtained, hereinafter referred to as "the court", and shall be governed by procedures outlined herein and randomly re-allotted by the court.

D. The court shall render a final decision on all petitions for compensation filed in accordance with the provisions of this Section and shall be tried by the judge alone. The court may consider any relevant evidence regardless of whether it was admissible in, or excluded from, the criminal trial in which the petitioner was convicted.

E. The attorney general shall represent the state of Louisiana in these proceedings. … Unless otherwise provided herein, the Louisiana rules of evidence shall apply.

F. The petition shall contain a recitation of facts necessary to an understanding of the petitioner's innocence that is supported by either the opinion or order vacating the conviction and sentence and/or by the existing court record of the case. Specific citations for each fact tending to show innocence shall be made to the existing record.

G. The petitioner shall attach to the petition:
    (1) A copy of the judgment, opinion, or pardon that vacated the petitioner's conviction and sentence.
    (2) A copy of the verdict of acquittal or of the entry of an order of nolle prosequi, or other action of the state declining to re-prosecute the petitioner.
    (3) A record from the Department of Public Safety and Corrections of the time the petitioner spent in the custody of the Department of Public Safety and Corrections.

H. (1) After a contradictory hearing with the attorney general, the court shall render a decision as soon as practical. If, from its findings of fact, the court determines that the petitioner is entitled to compensation because he is found to be factually innocent of the crime of which he was convicted, it shall determine the amount of compensation due in accordance with the provisions of this

Section, and it shall order payment to the petitioner from the Innocence Compensation Fund which shall be created specifically for the administration of awards under this Section.

*The Requirement of "New, Material, Noncumulative, and Conclusive Evidence"*

To determine whether the trial court legally erred in applying the incorrect standard as argued by petitioner, we first examine the judgment of the trial court, including the written reasons accompanying the judgment, before proceeding to an examination of the relevant case law and our own analysis of the statute. We acknowledge that appeals are taken from the judgment, not written reasons for judgment as per La. C.C.P. art. 1918; nevertheless, a court of appeal can use reasons for judgment to gain insight into the district court's judgment. *Wooley v. Lucksinger*, 09-0571 (La. 4/1/11), 61 So.3d 507, 572. The trial court, in its written reasons, articulated the following standard which it later applied to the evidence presented:

> La. R.S. 15:572.8 requires more than just a showing that a conviction has been overturned or vacated. In order to prevail on petition for compensation for wrongful conviction, the defendant must prove by 'clear and convincing' scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted. The 'clear and convincing' standard is a substantially high burden of proof exceeded only slightly by the criminal conviction burden of 'beyond a reasonable doubt.' Petitioners must prove it is highly probable that they are factually innocent of the crimes for which they were convicted. Actual innocence must involve new, material, noncumulative, and conclusive evidence which meets an extraordinarily high standard. *In re: Williams*, 984 So.2d 789 (La. App. 1st Cir. 2/20/08); *Burrell v. State*, 184 So.3d 246 (La. App. 2nd Cir. 1/13/16).[8] (Emphasis supplied.)

The legal question presented here is whether the trial court legally erred in requiring Mr. Alexander to present "new, material, noncumulative, and conclusive

---

[8] We observe that the trial court's citation to *Williams* is incorrect. Nowhere in the *Williams* case, in which the First Circuit interpreted La. R.S. 15:572.8 for the first time since its adoption in 2005, did that Court make any reference to the evidentiary standard in criminal post-conviction relief proceedings or the requirement of "new, material, noncumulative, and conclusive evidence." Reliance on this case for such proposition is erroneous when the cited authority does not directly support the proposition. The post-conviction relief evidentiary standard applicable in criminal post-conviction relief proceedings was first incorporated into the burden of proof requirement of La. R.S. 15:572.8 by the Second Circuit in *Burrell, infra*.

evidence which meets an extraordinarily high standard" in order to prove he is factually innocent of the crime for which he was convicted. This legal question is a *res nova* issue for this Court, and additionally one on which other Louisiana Courts of Appeal have disagreed. *See Burrell v. State*, 50,157 (La. App. 2 Cir. 1/13/16), 184 So.3d 246, 253, *writ denied*, 16-0523 (La. 5/2/16), 206 So.3d 879, and *Jones v. State*, 21-1205 (La. App. 1 Cir. 8/24/22), 348 So.3d 771, 778, *writ granted*, 22-1455 (La. 1/11/23), 352 So.3d 556 *and aff'd*, 22-1455 (La. 5/5/23), --- So.3d ---.

In its discussion of how a petitioner might meet the burden of proving factual innocence, the Second Circuit in *Burrell* turned to statements made by the Supreme Court about factual innocence in two post-conviction relief cases, *State v. Conway*, 01-2808 (La. 4/12/02), 816 So.2d and *State v. Pierre*, 13-0873 (La. 10/15/13), 125 So.3d 403, to hold that a *bona fide* claim for factual innocence requires new, material, noncumulative, and conclusive evidence which meets an extraordinarily high standard and undermines the prosecution's entire case. 184 So.3d at 253. In its adoption of the standard of factual innocence from post-conviction relief hearings, the *Burrell* Court stated, "[t]he factual situations and the relief sought here and in *State v. Pierre* are different, but the burden imposed on petitioners is essentially the same: to prove factual innocence despite a former conviction." *Id.*

More recently, the First Circuit in *Jones, supra*, determined that the legislature's recent adoption of 2021 La. Act No. 104 in 2021, which enacted a new Code of Criminal Procedure Art. 926.2 to provide a freestanding post-conviction claim of factual innocence not based on DNA evidence, while leaving the language of La. R.S. 15:572.8 unchanged, reflected an intention by the legislature to create different burdens of proving factual innocence in a claim for post-conviction relief and a claim for compensation for wrongful conviction and

imprisonment; therefore, the requirement that the petitioner introduce "new, material, noncumulative, and conclusive evidence" is inapplicable in La. R.S. 15:572.8 proceedings. *Jones*, 348 So.3d at 778.

The Louisiana Supreme Court has recently affirmed the conclusion reached by the First Circuit in *Jones*. *State v. Jones*, 22-1455 (La. 5/5/23) --- So.3d ---, 2023 WL 3263861. The Court held that a plain reading of La. R.S. 15:572.8 shows that the requirement that the petitioner present "new, material, noncumulative, and conclusive evidence" in order to prove factual innocence is nowhere stated in the statute. *Id*. The Court emphasized that La. R.S. 15:572.8 is *sui generis*, and governs a unique situation: it provides compensation from a special fund set aside in the state treasury to innocent persons wrongfully convicted and imprisoned. *Id*. (citing *Burge v. State*, 10-2229 (La. 2/11/11), 54 So.3d 1110, 1113). As such, the statute itself is the only relevant authority governing the petition for compensation for wrongful conviction and imprisonment. *Id*. Under La. R.S. 15:572.8, a petitioner has the burden of proving it is highly probable or much more probable than not that he did not commit the crime for which he was convicted or any other crime from the same set of facts. *Id*.

In accordance with the Supreme Court's recent decision in *Jones*, we find that the trial court legally erred in adopting the requirement of *Burrell* that proof of factual innocence requires "new, material, cumulative, and conclusive evidence." Before turning to a *de novo* review of the evidence, having established what is not required, we consider how a petitioner may go about proving factual innocence, or the nonexistence or non-occurrence of a fact.

*Standard of Proof for Factual Innocence Pursuant to La. R.S. 15:572.8*

The starting point for the interpretation of any statute is the language of the statute itself. *Anderson*, *supra*; *In re Med. Review Panel Proceedings of Glover*,

17-201 (La. App. 5 Cir. 10/25/17), 229 So.3d 655, 661. The paramount consideration in statutory construction is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law. *Martin v. Thomas*, 21-1490 (La. 6/1/22) --So.3d--, (*citing M.J. Farms, Ltc. v. Exxon Mobil Corp.*, 07-2371 (La. 07/01/08), 998 So.2d 16, 27. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written with no further interpretation made in search of the Legislature's intent. La. C.C. art. 9. Where the language of the law is susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. C.C. art. 10. When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. art. 12.

Beginning with Subsection A, the language of La. R.S. 15:572.8 sets forth three requirements for entitlement to compensation for wrongful conviction and imprisonment: 1) that the petitioner has served in whole or in part a sentence of imprisonment under the laws of this state for a crime for which he was convicted;[9] 2) the conviction of the petitioner has been reversed or vacated; and 3) "[t]he petitioner has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted." The first two requirements of this Subsection are uncontested here, and therefore we turn our attention to the third requirement.

We begin by observing that, on its face, the language "has proven" is ambiguous, in that it is susceptible to two different meanings. It may first be understood to mean that entitlement to compensation for wrongful conviction and imprisonment may only be awarded to a petitioner who has already proven his

---

[9] *See State v. Hill*, 13-861 (La. App. 4 Cir. 9/18/13), 125 So.3d 1200, 1202, *writ denied*, 13-2352 (La. 12/6/13), 129 So.3d 536; *Gemelli v. State*, 22-345 (La. App. 4 Cir. 11/17/22), 352 So.3d 131, 134.

factual innocence in the course of previous criminal post-conviction relief proceedings; for example, in cases where the petitioner has been exonerated on the basis of DNA evidence. On the other hand, examining this language in the context of the statute as a whole, it is clear that the legislature intended there to be a contradictory fact-finding hearing at which the trial judge is to consider evidence and make a determination regarding the petitioner's factual innocence. These meanings are not mutually exclusive, and they indicate how the procedures for compensation for wrongful conviction and imprisonment are inextricably linked to criminal post-conviction relief proceedings. We find this language to mean that a petitioner is entitled to compensation if he has proven his factual innocence of the crime for which he was convicted either during the course of criminal post-conviction relief proceedings or, if his conviction was not vacated or reversed on the basis of factual innocence, during the course of the contradictory hearing on the civil petition for compensation for wrongful conviction and imprisonment.

This finding is relevant in this case because the January 30, 2018 Order vacating Mr. Alexander's conviction was granted on the basis of the State's admission that Mr. Alexander received ineffective assistance of counsel, but did not contain any specific findings relating to his factual innocence.

In addition to allowing a petitioner the opportunity to prove his factual innocence at a future contradictory hearing in cases where proof of factual innocence was not the basis for his conviction being set aside in a criminal post-conviction proceeding, the statutory language of Subsections A(2) and B of La. R.S. 15:572.8 also contains three unique features that directly bear on the petitioner's burden of proof: 1) a shift in the burden of producing evidence regarding the commission of a crime (or, more precisely, in the case of an individual allegedly wrongfully accused, the non-commission of a crime) from the State to the accused; 2) the adoption of a "clear and convincing" burden of

persuasion; and 3) the requirement of using evidence to prove "factual innocence," or the nonexistence or non-occurrence of a fact. We examine these in turn.

*Shift in the Initial Burden of Production*

Generally, in civil matters, the party seeking relief bears the initial burden of producing evidence to prove the claims alleged in his petition, while in criminal matters, the State bears the burden of producing evidence to sustain its burden of proof. *See generally* Proof of Facts, 19 La. Civ. L. Treatise, Evidence and Proof § 4.2 (2d ed.). Because of the presumption of innocence of the accused in criminal matters, the accused may rely on an absence of evidence and is not required to provide an affirmative defense or any other evidence of his own. To the contrary, in a civil petition for compensation for wrongful conviction and imprisonment, a petitioner does not have the benefit of a presumption of innocence, but rather is tasked with producing evidence to prove his factual innocence. Consequently, a petitioner making a claim for compensation for wrongful conviction and imprisonment, who has presumably had neither the benefit of his liberty nor, in all likelihood, the benefit of resources to gather, test, and preserve evidence while incarcerated, thus operates from a position of disadvantage when attempting to obtain evidence years, or possibly decades, after the commission of the crime of which he was accused.

In light of these evidentiary challenges, the provision in Subsection F of La. R.S. 15:572.8 allows the trial court to consider any relevant evidence regardless of whether it was admissible in, or excluded from, the criminal trial in which the petitioner was convicted. As the First Circuit in *Williams* stated, this statutory language reflects a legislative intent that little limitation be placed on the introduction of evidence related in any way to the convictions and the proof of factual innocence. *Williams*, 984 So.2d at 793. The language of Subsection F also reflects a legislative intent that the factfinder have as much access as possible to

whatever limited evidence may be available under the unique circumstances presented by a petition for compensation for wrongful conviction and imprisonment. The trial court is not constrained to a sterile examination of the testimony presented at the initial trial as it appears in the record; rather, the entirety of the evidence, whether admitted at the underlying trial or excluded, is properly considered in the determination of factual innocence. *State v. Ford*, 50,525 (La. App. 2 Cir. 5/18/16), 193 So.3d 1242, 1249, *writ denied*, 16-1159 (La. 10/10/16), 207 So.3d 405.

*The "Clear and Convincing" Burden of Persuasion*

The burden of persuasion is the degree of certainty to which a trier of fact believes, on the evidence presented, that the alleged fact is true. *See generally* The Burdens of Proof: the Burden of Producing Evidence and the Burden of Persuasion, 2 McCormick on Evidence § 336 (8th ed.). It becomes a crucial factor only if the parties have sustained their burdens of producing evidence and only when all of the evidence has been introduced. Generally, the burden or standard of persuasion in criminal prosecutions is "beyond a reasonable doubt," while in civil cases it is "by a preponderance of the evidence." The "clear and convincing" standard is an intermediate one used rarely, but most often in cases involving the deprivation of individual rights not rising to the level of criminal prosecution, such as commitment to a mental hospital, termination of parental rights, or denaturalization.[10] Most recently in *Jones*, our Supreme Court has held that to meet the "clear and convincing" standard, a petitioner must prove the existence of a contested fact is highly probable, or much more probable than its non-existence. 2023 WL 3263861 (*citing Talbot v. Talbot*, 03-814 (La. 12/12/03), 864 So.2d 590, 598).

---

[10] To terminate parental rights in Louisiana, the state has the burden of proving one of the statutory grounds by "clear and convincing" evidence. *State in Interest of A.L.D.*, 18-1271 (La. 1/30/19), 263 So.3d 860, 863.

In considering the application of various standards, U.S. Supreme Court Justice John M. Harlan, II has observed:

> [T]hough the labels used for alternative standards of proof are vague and not a very sure guide to decision making, the choice of the standard for a particular variety of adjudication does … reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations. … [I]n a judicial proceeding in which there is a dispute about the facts of some earlier event, the fact-finder cannot acquire unassailably accurate knowledge of what happened. Instead, all the fact-finder can acquire is a belief of what probably happened. The intensity of this belief—the degree to which a fact-finder is convinced that a given act actually occurred—can, of course, vary. In this regard, a standard of proof represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.

*In re Winship*, 397 U.S. 358, 369-70, 90 S.Ct. 1068, 1075-76, 25 L.Ed.2d 368 (1970) (Harlan, J. Concurring).

The requirement of "clear and convincing" evidence of factual innocence in La. R.S. 15:572.8 may be best understood then not as intended to decrease the likelihood of those wrongfully convicted and imprisoned from receiving compensation, but rather as intended to decrease the likelihood that a person whose conviction has been reversed or vacated, but who was nevertheless involved in criminal activity, receives compensation. This understanding is supported by the language in Subsection B of the statute requiring that the petitioner not commit the crime for which he was convicted nor any other crime based upon the same set of facts, and additionally by the language in Subsection H(5) that disallows compensation to the petitioner for any portion of a sentence in prison during which he was also serving a concurrent sentence for the conviction of another crime.

*Proof of "Factual Innocence"*

In its discussion of "factual innocence" in *Williams*, the First Circuit noted, "Unlike the well-known and understood burden of proving guilt beyond a reasonable doubt applicable in all criminal convictions, the concept of proving 'factual innocence' is novel and indeed unprecedented in the context of criminal convictions, and even civil proceedings, under Louisiana law. The statute defines the term … yet that definition is less than instructive on the type or amount of proof necessary [to satisfy the burden.]" *Williams*, 984 So.2d at 793. Though written a decade and a half ago, in the context of proceedings for compensation for wrongful conviction and imprisonment, this concept continues to be novel and, in this Circuit, unprecedented.

Like the shifting burden of production and the intermediate burden of persuasion, the requirement that the petitioner prove he did not commit a crime is a potential source of confusion for the fact-finder. This is because such a requirement completely dispenses with the assumption of innocent-until-proven-guilty that is the bedrock principal underlying our system of criminal justice. Because the conviction has been reversed or vacated, the petitioner is legally innocent and must provide satisfactory proof of his factual innocence in order to secure compensation, not directly from the parties responsible for the wrongful conviction and imprisonment, but from a special fund that distributes the risk of such errors or failures across the State more broadly.[11] Confusion may also arise because the statute appears to require the petitioner to "prove a negative," a task commonly considered impossible.

Mindful of this and the principals of statutory interpretation stated above, we turn to the language in question:

---

[11] Subsection N provides: "… Any judgment rendered pursuant to this Section shall be payable only from the fund established herein. No state agency, political subdivision, constitutional office, nor employee thereof shall be liable for any payment ordered pursuant to this section."

(2) The petitioner has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted.

…

B. For the purposes of this Section, "factual innocence" means that the petitioner did not commit the crime for which he was convicted and incarcerated nor did he commit any crime based upon the same set of facts used in his original conviction.

According to this language, the petitioner has the burden of proving that he did not commit a crime in order to be entitled to compensation for his wrongful conviction and imprisonment. This burden may conceivably be met three ways.

First, the petitioner may produce probative, affirmative evidence that another person perpetrated the crime. Such evidence may be direct, *e.g.*, when another person has confessed to or been convicted of the crime at issue, or circumstantial, *e.g.*, photographs of a man who better fits the description of the perpetrator. *See State v. Ruano*, 19-709 (La. App. 4 Cir. 3/4/19), 294 So.3d 44, 49.[12] The First Circuit considered such evidence in the *Jones* case. In that case, to meet his burden of proving that he did not commit an aggravated rape back in 1971, Mr. Jones introduced evidence of the similarities between the victim's rape and one committed by another man, Arnold Ray O'Conner, that occurred twenty-seven days later at the same location under nearly identical circumstances. 348 So.3d at 780. The First Circuit found that the evidence of Mr. O'Conner's guilt, compared to the evidence of Mr. Jones's guilt, supported the finding that Mr. Jones was factually innocent of the crime. *Id*. at 783.

Second, the petitioner may point out the absence of evidence establishing him as the perpetrator of the crime or attempt to cast into doubt the prosecution's evidence. Because of the shifted burdens of production and persuasion, the petitioner may not rely on an absence of prosecutorial evidence alone to satisfy his burden of proving factual innocence as may be done by the accused in a criminal

---

[12] We note that it is not the responsibility of the petitioner to prove someone else perpetrated the crime.

proceeding. It is nevertheless incumbent on the petitioner to call to the factfinder's attention the quantity and quality of the evidence presented that established his conviction since both factors are directly relevant to a determination of his factual innocence. This may be particularly important in cases where there is little and/or poor evidence linking the petitioner to the crime. Evidence regarding the investigation, trial, and subsequent proceedings may be pertinent under this consideration. For example, in *Ruano*, the State at trial offered testimony of eyewitnesses who identified Mr. Ruano as a thief and assailant. 294 So.3d at 48. It was later disclosed after Mr. Ruano's conviction that some of these eyewitnesses were offered assistance with immigration visas in exchange for their cooperation in the case. *Id*. at 52. Such evidence supported Judge Belsome's conclusion in *Ruano* that "[t]he objective evidence is completely inconsistent with the State witnesses' identifications of [Ruano.]" *Id*.

Another example of evidence introduced to cast doubt on the evidence linking the petitioner to the crime may be found in *Jones*. In that case, where the State's prosecution rested entirely upon the victim's identification, Mr. Jones introduced the testimony of an expert witness in eyewitness identification who testified as to various factors that indicate the potential for inaccuracies, such as the presence of a weapon, prolonged delay between the crime and the identification, and low-confidence identifications. *Jones*, 2023 WL 326386. Such expert testimony was recognized as undermining the evidentiary value of the victim's identification. *Id*.

Third, the petitioner may provide evidence of absence or evidence that excludes him as the perpetrator of the crime.[13] Such evidence, as contemplated by the statute, may be scientific such as DNA evidence, forensic bite marks or

---

[13] Evidence of absence is not the same as an absence of evidence. *See White v. Wal-Mart Stores, Inc.*, 97-0393 (La. 9/9/97), 699 So.2d 1081, 1086.

fingerprints, or non-scientific evidence, such as alibi testimony from the petitioner or another witness, or some other kind of physical evidence, that may directly or circumstantially exclude the petitioner as the perpetrator of the crime. We again turn to *Ruano* as an example. In that case, the petitioner provided photographs of numerous tools, a statement showing a $100,000.00 line of credit as well as photographs and birth certificates of his children. 294 So.3d at 49. Where the perpetrator of the battery and simple theft of tools was described by witnesses as driving a car with an infant in the backseat, the introduction of such evidence served to exclude, even if only circumstantially, Mr. Ruano as the perpetrator of the crime because he lacked motive and did not have an infant child like the one described by witnesses. *Id.*

We note that we set forth the above as methods by which a petitioner may prove that he did not commit a crime, not as factors or requirements that the petitioner must meet in order to satisfy his burden of proof under the language of the statute. All three may not be implicated in every case concerning a petition for compensation.[14] They are meant as guidance for the factfinder and the petitioner to facilitate the best resolution in a unique proceeding.

*De Novo Review of the Evidence Presented*

We next analyze the evidence presented in light of the aforementioned principles and methods to determine whether Mr. Alexander has satisfied his burden of proving by clear and convincing evidence that he is factually innocent of the crime for which he was convicted. In particular, we first review the only evidence linking Mr. Alexander to the crime, *i.e.*, the identification by B.N. Next, we review the evidence introduced by Mr. Alexander that excludes him as the perpetrator of the crime, *i.e.*, the DNA test results. Lastly, we consider the

---

[14] We note as well that these categories of proof are not mutually exclusive: DNA evidence that excludes one person as a perpetrator may also implicate another person.

probative value of a single human head hair collected at the crime scene but never tested or introduced as evidence.

Eyewitness Identification

The propositions "B.N. accurately identified Mr. Alexander as the perpetrator" and "the three black pubic hairs collected at the crime scene were left by the perpetrator" cannot both be true. Because of the paucity of evidence available regarding the perpetrator of this crime, due to both the passage of time and the State's destruction of evidence, both the State and Mr. Alexander must credit some statements made by B.N. that tend to support their respective contentions in this case, while at the same time calling into question other statements of B.N. that do not support their respective contentions.

The State offers B.N.'s in-court identification of Mr. Alexander at trial and her pre-trial identifications of Mr. Alexander in both a photo array and an in-person line up, as well as her statements regarding the certainty of her identification in interviews decades later, as evidence that Mr. Alexander is guilty of the crime of aggravated rape.[15] In response, Mr. Alexander does not question B.N.'s credibility, or suggest that she has intentionally misidentified him as her attacker, but argues rather that her identification of him is mistaken.

In support of this contention, Mr. Alexander has introduced the expert testimony of Dr. Nancy Franklin as a means to explain how B.N.'s identifications of him were in error.[16] Dr. Franklin, after reviewing the record of the criminal trial of Mr. Alexander, testified to a body of scientific, data-driven research demonstrating well-documented influences on eyewitness identification, including a large number of factors that have been found to impair eyewitness

---

[15] Notably, B.N.'s eyewitness identifications of Mr. Alexander as her attacker is the only evidence offered by the State at trial, and also in these proceedings, that implicates Mr. Alexander as the perpetrator of the rape.

[16] Dr. Franklin was accepted by joint stipulation with the State as an expert in the field of "eyewitness identification and memory," and allowed to testify as such at the compensation trial. She has her PhD in the field of Cognitive Psychology.

identification.[17]  The bibliography of studies referenced by Dr. Franklin was admitted into evidence without objection.  The factors discussed included:  the witness's opportunity to view the assailant; stress; weapon focus; partial disguise; cross racial identification; the lapse of time between incident and positive identification; post-event suggestion; non-blind administrators of identification procedures; the use of few and poor quality fillers in identification arrays; exposure effect; commitment effect; prior false identification; confidence malleability; hindsight bias; and the general unreliability of in-court identification.

In order to satisfy his evidentiary burden under La. R.S. 15:572.8, Mr. Alexander is not required to show how the only evidence linking him to the crime, the eyewitness testimony of B.N., *supports* his claim of factual innocence.  Rather, Mr. Alexander's objective in providing Dr. Franklin's testimony was to introduce evidence that could rationally explain how B.N.'s identification of him has been in error.  Dr. Franklin's testimony regarding the science of identification and memory provides a rational explanation for erroneous identification and B.N.'s subsequent statements regarding her confidence in the identification.

The State did not cross examine Dr. Franklin, nor did it in any other manner challenge the scientific, data-driven research she offered or her methodology.  At most, the State on appeal challenges the applicability of a few factors mentioned by Dr. Franklin based on its appreciation of the facts surrounding the crime and subsequent investigation and concludes that "Mr. Alexander failed to demonstrate by clear and convincing evidence that B.N.'s identification of him in some way supported his claim of factual innocence."  This statement indicates a misunderstanding of Mr. Alexander's evidentiary burden.

In order to satisfy his evidentiary burden under La. R.S. 15:572.8, Mr. Alexander is not required to show how the only evidence linking him to the crime, the eyewitness testimony of B.N., *supports* his claim of factual innocence.  Rather, Mr. Alexander's objective in providing Dr. Franklin's testimony was to introduce evidence that could rationally explain how B.N.'s identification of him has been in error.  Dr. Franklin's testimony regarding the science of identification and memory provides a rational explanation for erroneous identification and B.N.'s subsequent statements regarding her confidence in the identification.

---

[17] Like Mr. Alexander, Dr. Franklin did not provide any testimony that attacked the credibility of B.N. Additionally, in accordance with La. Code of Evidence article 702(B), Dr. Franklin did not offer an opinion as to whether B.N.'s memory or eyewitness identification is accurate.

To undermine Dr. Franklin's testimony, the State argues that her opinions were based on factual errors. Such claims are inapposite: Dr. Franklin was not offered as, nor did she testify as, a fact witness. Thus, we view the opposition of the State to Dr. Franklin's testimony not as a repudiation of her general opinions regarding the reliability of eyewitness identification under certain circumstances, but rather an effort to question the applicability to this case, and appropriate weight to be given to, some of the factors discussed by Dr. Franklin.

Although we acknowledge that some of the factors discussed by Dr. Franklin, such as the degree of trauma and stress experienced by B.N. and the opportunity for her to observe her assailant, are subject to the reader's subjective interpretation and appreciation of the circumstances of the crime contained in the criminal trial record, and are therefore difficult to weigh in favor of or against Mr. Alexander's claim, we also recognize that other of the factors discussed, such as cross racial identification, the lapse of time between the crime and a positive identification, and non-blind administration of identification procedures are indisputably applicable to this case and support Mr. Alexander's claim that B.N.'s identification of him as the perpetrator of this crime was in error.

Accordingly, upon *de novo* review, we find that Dr. Franklin's uncontroverted scientific and data-driven evidence regarding factors that are indisputably applicable to this case, supports Mr. Alexander's claim of factual innocence by explaining how B.N.'s identification of him was in error.

DNA Test Results

In further support of his petition, Mr. Alexander introduced the Mitochondrial DNA test results on three pubic hairs collected from the crime scene. Mr. Alexander, long insistent that he did not commit this crime, for many years sought through post-conviction proceedings DNA testing on evidence collected at the scene of the crime. In 2016, by agreement of, and on joint motion

of, Mr. Alexander and the State, DNA testing was ordered on these three particular hairs.[18] The DNA test results on these hairs excludes Mr. Alexander as the source of the hairs. The fact that these hairs do not belong to Mr. Alexander is uncontroverted. Upon *de novo* review, we find this DNA evidence and the evidence introduced by Mr. Alexander that the tested hairs originated with the perpetrator of the crime provide compelling support for his claim of factual innocence.

In support of his claim, Mr. Alexander offered evidence to prove that the hairs collected by the Jefferson Parish Sheriff's Office technician belong to the perpetrator of this crime. The criminal trial record contains the documentary evidence establishing the collection of the hairs from the bathroom crime scene and the subsequent chain of custody of those hairs.[19] Presumably, this evidence was collected from the crime scene by the Jefferson Parish Sheriff's Office because of a belief that they may have been deposited by the perpetrator of the crime and could assist the Sheriff's Office in identifying him.

In support of his assertion that these three pubic hairs belong to the perpetrator of this crime, Mr. Alexander also relies upon the statements made by B.N. in interviews she gave to investigators for the Jefferson Parish District Attorney's Office in 2017 and investigators for the Louisiana Attorney General's Office in 2019. At that time, she stated that prior to the rape she had thoroughly cleaned the bathroom and that to her knowledge, the only black man present in that part of the shop or in the bathroom was the man who attacked her. She stated that there were workmen who could have used the bathroom during the renovation of

---

[18] There is no explanation in the record of this proceeding as to why the single head hair was excluded from this DNA testing.

[19] The location of the bathroom of the store as the scene of the crime is supported by crime scene photographs, testimony of the investigating officers, and numerous consistent statements from B.N. on the day of the occurrence concerning where the crime took place, including her narrative of how the perpetrator attempted to barricade her in the bathroom while he escaped, as well as photographs of bruises on her arm which B.N. claimed at the time came from the tile floor of the bathroom. To our knowledge, the State has never argued that the rape took place in any location other than the bathroom.

the store, but also stated it was unlikely that any of those workmen were black because the workmen hired were friends of her and her ex-husband, and they did not have any black friends at that time. These statements by B.N. tend to exclude the possibility of the pubic hairs collected at the scene being from anyone other than the perpetrator, thus pointing to someone other than Mr. Alexander as the perpetrator of this crime. Additionally, the State has offered no evidence to contradict or undermine the truthfulness of these statements from B.N.

In further evaluating the relative weight that the DNA test result evidence bears on the question of whether Mr. Alexander was the perpetrator of this crime, we are compelled to consider from the facts contained in the entire record, the likelihood of alternative explanations as to how, if Mr. Alexander were the perpetrator, the DNA test results in this case implicate someone other than Mr. Alexander. To reconcile the test results of the three pubic hairs with an assumption of Mr. Alexander as the perpetrator of this crime requires the factfinder to engage in improbable hypothesizing and the discrediting of uncontroverted evidence in the record regarding the collection of the evidence and its chain of custody.

Upon *de novo* review, we find the best explanation for the DNA test results indicating that the three pubic hairs belonged to an individual other than Mr. Alexander, to be that Mr. Alexander was not the perpetrator of this crime. Further, in considering *in toto* all of the evidence in this case, we find that the introduction of the DNA test results, along with the expert testimony of Dr. Franklin, is sufficient for Mr. Alexander to have carried his burden of proving his factual innocence by clear and convincing evidence. The only remaining question for this Court to resolve is what effect, if any, the lack of testing on the single head hair collected at the scene of this crime has on our determination that Mr. Alexander has otherwise carried his burden of proof.

<u>The Untested Head Hair</u>

Our review of the relevance that the existence of the single untested head hair has to this case is twofold. First, this Court must determine whether, because Mr. Alexander has the burden of proof on his claim for compensation, his decision not to have the single head hair tested and provide the results, automatically prevents his ability to carry his burden of proving his factual innocence by clear and convincing evidence. In other words, was Mr. Alexander, in order to carry his burden of proof, *required* to have the head hair tested? Secondly, this Court must determine the relative weight, if any, to give to the mere existence of this untested head hair as it relates to Mr. Alexander's factual innocence.

In answering the first of these questions, we begin by observing that La. R.S. 15:572.8 does not impose either an explicit or implicit requirement that an individual seeking compensation for wrongful conviction and imprisonment must test *all* evidence that is collected in a case, that is subject to scientific testing, in order to carry his burden of proof. Nor, as previously stated, does the statute require that such individual prove his factual innocence beyond *all* doubt, or even by the criminal standard of beyond a reasonable doubt.

Having already pointed out the disadvantages faced by an individual seeking compensation for wrongful conviction and imprisonment, and the Louisiana Supreme Court's recent decision in *Jones* regarding the applicable burden of proof for such individuals, and finding no such requirement in the statute authorizing compensation, we decline to find that there is a *per se* requirement that a petitioner for compensation must test all evidence that is collected in a case, that is subject to scientific testing, in order to carry his burden of proof. Rather, like in other civil proceedings, when the petitioner has carried his initial burden of proof, the burden shifts to the defendant to produce evidence that refutes the petitioner's case. In this case, the State chose to rely upon the mere existence of the single head hair,

untested, rather than having it tested to confirm the State's suppositions concerning that hair.[20, 21]

Next, because we are required to review *all* of the evidence, we turn to an analysis of the relative weight that should be given to the mere existence of this single untested head hair. The question that we must answer in this regard is whether the mere existence of the untested head hair, collected at the scene of the crime, creates sufficient doubt regarding Mr. Alexander's factual innocence such that he is not entitled to compensation for wrongful conviction and imprisonment.

As previously indicated, this single head hair remains untested, so the results of DNA testing on this hair remain unknown. As such, its mere existence as having been collected from the bathroom where B.N. states the two rapes took place, has virtually no evidentiary weight in either including or excluding Mr. Alexander as its possible source.[22]

In addressing the three hairs that were tested and determined to not come from Mr. Alexander, the State suggests that the mere fact that they were collected from the crime scene is not conclusive proof that those hairs came from the perpetrator of this crime. Indeed, the State's position in this case regarding Mr. Alexander's guilt is completely dependent upon this argument. In assessing the

---

[20] We note what was at stake at the time that the State chose not to test this single head hair. If the test result suggested by the State were obtained, *i.e.*, a positive match to Mr. Alexander, with no explanation as to how his head hair was found at the scene of the crime, we suppose that either Mr. Alexander's conviction would not have been vacated, or at he very least, the State would have retried him on the compelling nature of that test result. Yet, when the early release from incarceration of someone convicted of a brutal rape was at stake, the State chose not to test that single head hair. Now, in the context of this compensation proceeding, what is at stake is simply monetary compensation from a fund that is specifically designated for persons who have been wrongfully convicted and imprisoned by the State. While we apply no adverse presumption against the State in the current compensation proceeding as to what the test *result* might have been if it had chosen to have the single head hair tested, we do consider as part of our review the implications of the State's *decision* not to have the head hair tested during the post-conviction proceedings.

[21] We also note the inconsistency in the State's current arguments as to the significance of this single untested head hair to the compensation litigation, with its own decision not to test this head hair during the post-conviction proceedings, when a test result consistent with the State's supposition that the hair belonged to Mr. Alexander clearly would have had significant implications for his release from incarceration.

[22] The untested head hair is identified as coming from a black male; however, we find that, because the potential pool of individuals in the Jefferson Parish area who fall into this category is so large, this information does very little to connect it to Mr. Alexander as its source.

weight to give the existence of the single untested head hair, we recognize that this same argument is equally applicable to the untested head hair, *i.e.*, the mere fact that it was collected at the crime scene is not conclusive proof that it came from the perpetrator of this crime. And if it did not come from the perpetrator of this crime, then it would have practically no evidentiary value, even if tested, to the question of Mr. Alexander's factual innocence.

Having analyzed the relative weight to be given to the mere existence of the untested head hair, we find it to be of very little evidentiary weight and certainly does not raise sufficient doubt regarding Mr. Alexander's factual innocence such that he is not entitled to compensation for wrongful conviction and imprisonment.

**CONCLUSION**

The trial court legally erred in its application of the burden of proof pursuant to La. R.S. 15:572.8, thus requiring this Court to conduct a *de novo* review of the evidence presented. Upon our *de novo* review of all of the evidence, we find that Mr. Alexander has carried his burden of proving his factual innocence by clear and convincing evidence and is therefore entitled to compensation for his wrongful conviction and imprisonment. Specifically, we find that he has proven his factual innocence of the crime for which he was convicted by clear and convincing evidence, including DNA evidence that excludes Mr. Alexander as the perpetrator of the crime with a high degree of probability, together with Dr. Franklin's uncontroverted expert testimony that provides a scientific, data-driven explanation for B.N.'s statements identifying Mr. Alexander as the perpetrator. Accordingly, we reverse the judgment of the trial court and remand this matter with instructions to the trial court to calculate the amount of compensation to be awarded to Mr. Alexander in accordance with the provisions of La. R.S. 15:572.8.

<b><u>REVERSED AND REMANDED</u></b>

STATE OF LOUISIANA                    NO. 22-CA-12

VERSUS                                FIFTH CIRCUIT

MALCOLM J. ALEXANDER                  COURT OF APPEAL

                                      STATE OF LOUISIANA


**MOLAISON J., DISSENTS WITH REASONS**

For the reasons more fully discussed below, I dissent from the majority opinion which conducts a *de novo* review of the evidence. Instead, I would remand the matter to allow the trial court to consider the burden of proof in the supreme court's recent opinion of *State v. Jones*, 22-1455 (La. 5/5/23) -- So.3d --, 2023 WL 3263861.

When this appeal was first submitted for consideration, before the assignment of a five-judge panel, the issue of a plaintiff's burden of proof under La. R.S. 15:572.8 had created a split among some Louisiana appellate courts. This appeal presented a *res nova* issue for this circuit. The judgment *itself*[1] at issue in this matter is silent as to the burden of proof standard used by the trial court to determine the merits. To the extent that Mr. Alexander argued that factors outside of the judgment demonstrated the court's error in the interpretation of existing standards, I concluded that *Burrell v. State*, 50,157 (La. App. 2 Cir. 1/13/16), 184 So.3d 246, 253, *writ denied*, 16-0523 (La. 5/2/16) applied to his claim. I further concluded there was no manifest error in the trial judgment, as the trial court's findings are reasonable on the

---

[1] There is a long-standing premise that appeals are taken from the judgment, not the written reasons for judgment. La. C.C.P. art. 1918. This is, in part, because the reasons for judgment set forth a basis which is not binding. *Aderholt v. Metro Sec., Inc.*, 14-880 (La. App. 5 Cir. 3/25/15), 169 So.3d 635, 640, *citing, Metairie Carnival Club, Inc. v. Lundgren*, 12-246 (La. App. 5 Cir. 10/20/12), 102 So.3d 999, 1002. Similarly, oral reasons for judgment are not part of the official judgment which the trial judge signs or from which appeals are taken. *Par. of St. Charles v. Young*, 99-411 (La. App. 5 Cir. 12/15/99), 750 So.2d 276, 278. Judgments are often upheld on appeal for reasons different than those assigned by the trial judges. *Wooley v. Lucksinger*, 09-0571 (La. 4/1/11), 61 So.3d 507, 572.

record as a whole.[2]  Even as this matter was submitted for consideration a second time on appeal, the issue of the burden of proof in these types of cases remained unsettled. However, as the appeal was pending review, our supreme court issued its opinion in *State v. Jones*, *supra*, which makes clear that the approach in *Burrell* is now disfavored.

Even if factors outside of the four corners of the judgment are considered in the instant case, the entirety of the record shows the trial court indicated at different times during the hearing on Mr. Alexander's petition, that it was the plaintiff's burden to show his factual innocence by "clear and convincing" evidence.  This alone is not an incorrect recitation of La. R.S. 15:572.8(A)(2), which provides generically that a petitioner must prove "by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted." Constrained to review the judgment alone, I do not find that *State v. Jones, supra,* alters my analysis.   I maintain my original position concerning the issue.

It follows that also I disagree with the decision to conduct a *de novo* review of the evidence and decide the merits of Mr. Alexander's claim. From a perch of hindsight, the majority assumes an incorrect application of the law by the trial court that the judgment itself does not demonstrate. Even if it is presumed from sources extraneous to the judgment itself that the trial judge did apply a standard requiring Mr. Alexander to offer evidence that was "new, material, noncumulative, and conclusive . . . which meets an extraordinarily high standard," the majority ignores that at the time the trial

---

[2] Appellate courts have found that upon review of an Application for Compensation for Wrongful Conviction and Imprisonment pursuant to La. R.S. 15:572.8, great weight must be afforded to the findings of the trier of fact and, in turn, the manifest error standard should apply. Further, "[t]he issue is not whether the trial court's findings are right or wrong, but whether they are reasonable on the record as a whole. *State v. Ruano*, 19-0709 (La. App. 4 Cir. 3/4/19), 294 So.3d 44, 46, *writ denied*, 20-00676 (La. 10/20/20), 303 So.3d 311, *citing State v. Ford*, 50,525 (La. App. 2 Cir. 5/18/16), 193 So.3d 1242, 1247.

court rendered the merits in this case, there was a split among the circuits on the issue of a claimant's burden of proof under La. R.S. 15:572.8. As noted above, while today *State v. Jones* makes clear that the approach in *Burrell* is now disfavored, this was not previously an uncontroverted issue. However, instead of allowing the trial court to reconsider the issue using the Supreme Court's new guidance, the majority, in essence, penalizes the trial court for not being prescient, usurps its ability to exercise its discretion, and forecloses on the opportunity to correct its perceived mistake.

The supreme court has held that in limited circumstances, when necessary to reach a just decision, an appellate court should remand the case to the trial court under the authority of La. C.C.P. art. 2164, rather than undertaking a *de novo* review. The supreme court has also recognized that *de novo* review is not the best course of action in every case. *Rhodes v. Schultis*, 13-663 (La. App. 5 Cir. 4/23/14), 140 So.3d 331, 338, *writ denied*, 14-1081 (La. 9/12/14), 148 So.3d 937, *citing Wegener v. Lafayette Ins. Co.*, 10-810 (La. 3/15/11), 60 So.3d 1220, 1233. If the instant judgment must necessarily be reversed, I believe that a remand to the trial court for consideration of the facts using the *Jones* standard is warranted. As the trial court has already received the evidence and testimony and has a record to consider, this outcome would not be judicially inefficient.

*A victim's credibility*

Because the majority has assessed the evidence presented at trial to rule on the merits of the appeal, I also write to provide reasons why I dissent from their conclusions.

I do not take issue with many of the facts relied upon by the majority to reverse the trial court's ruling, as these speak for themselves. I do, however, find certain aspects of the majority's characterization of the

evidence and presumptions troubling concerning B.N. I disagree with the analysis in the opinion after substituting its opinion for that of the trial court.

One significant obstacle to Mr. Alexander's claim of factual innocence is his identification by B.N. as the man who raped her. In the realm of criminal law, Louisiana's jurisprudence gives great credibility to the victims of rape, permitting the testimony of the victim alone to be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *State v. Bruce*, 14-877 (La. App. 5 Cir. 3/25/15), 169 So.3d 671, 675, *writ denied*, 15-833 (La. 3/4/16), 187 So.3d 1007. In the instant case, as accurately stated by the trial court in its reasons for judgment, no DNA evidence was introduced at Mr. Alexander's criminal trial. Rather, his conviction was obtained based upon the testimony of the victim in this case, B.N. Mr. Alexander's petition alleged, however, that his trial counsel had been ineffective for failing to attack the credibility of her testimony by arguing that B.N.'s view of her assailant was limited and that there were points in the investigation when her identification of her assailant was "tentative."

B.N.'s original trial testimony provided details about how she ultimately identified Mr. Alexander as the man who raped her. The identification process and procedure used in the investigation were also recounted by several Jefferson Parish Sheriff's Office Deputies from the point of B.N.'s original description of her attacker, through the final identification of Mr. Alexander as her assailant.

The record before us demonstrates that B.N. identified Mr. Alexander after a prolonged process where she went through "hundreds" of pictures on an ongoing basis after she was raped. Although her identification of Mr.

Alexander was initially marked as "tentative" after she viewed a photographic lineup, B.N. insisted on an in-person lineup to make sure that her identification was accurate. Immediately after identifying Mr. Alexander, B.N. was asked to offer a voluntary statement in response to the question: "How are you sure #4 [Mr. Alexander] is the person who raped you?" She answered, "By his face. I recognized him completely and remembered his profile very well." Although the details of the offense appeared to have become obscured after 35 years, B.N. never wavered in her certainty that Mr. Alexander was the man who raped her.[3] On these facts, I cannot say that the trial court's conclusion about this issue was manifestly erroneous.

I find that certain portions of the opinion regarding B.N. lack objectivity and, more importantly, sensitivity toward the victim. I question the majority's choice of even referencing the fact that within minutes after she was beaten, raped, and sodomized, she failed to positively identify the first person[4] rounded up by police and placed in front of her as a potential suspect, whose orange bicycle and some physical attributes matched her description. What inference is to be drawn from that, aside from a subtle disparagement of a victim that she likely lost the one opportunity she had to have the true perpetrator convicted? In the interest of making the full record known, I would point to the fact that in the more recent interviews, B.N. stated that she had no recollection of the first suspect presented to her,

---

[3] When asked about how confident she was in her identification of Mr. Alexander in an interview with detectives on June 23, 2017, B.N. replied that she was "100%" certain, explaining that "when someone violates you like that and you see them face-to face, you don't forget that. You know, it's imprinted in your mind."

[4] Deputy Ralph Peperone testified that he was present when the first suspect was brought in for identification, and that the suspect was not Mr. Alexander. Deputy Peperone also testified that the first suspect did not fully match the description of the assailant, as he "did not have the emblem on his jacket and was clean shaven."

admittedly because following her assault she remained in the "nightmare" of "a state of shock."

I also find that the characterization by the panel of Dr. Franklin's testimony shows a subtle non-objectivity that weighs against the victim. The majority chooses select portions of testimony to support its conclusion while ignoring what falls outside the narrative. Dr. Franklin was questioned, based upon her review of the record, about factors that can give rise to inaccurate witness identification, and asked how those same factors may apply to the identification of assailants in "similar cases." The majority does not address in depth the claims set forth by the State regarding Dr. Franklin's testimony, which are that her generalized assessment contradicted, or misrepresented, facts in the record regarding B.N.'s identification of Mr. Alexander. As argued by the State in its brief:

> …[T]he record clearly shows that the victim, B.N., had sufficient time to view Mr. Alexander during the entirety of the encounter, that the victim, B.N. was not pressured to just "choose someone" as she rejected numerous prior photo lineups until presented with a photo of Mr. Alexander, that the victim was cognizant of the serious consequences of her identification of her attacker, and that the victim testified at trial that there was no doubt in her mind that Malcolm Alexander was the man who raped her. In addition, even a cursory review of this purported expert's testimony shows that she based her opinions on outright false or highly misleading factual assertions (i.e. expert falsely stated B.N. had little exposure to his face, falsely stated B.N.'s description of Alexander shifted over time, which it did not, egregiously attempts to cite and rely on B.N.'s recent statements about the incident (some 37 years later and after B.N. had suffered a stroke) in an attempt to deliberately distort the record to fit the expert's false narrative.

Here I find yet another reason to remand this matter to the trial court. Instead of giving the trial court the benefit of its judgment regarding the testimony of Dr. Franklin,[5] the majority sidesteps the manifest error standard and

---

[5] As observed by this Court in *Allensworth v. Grand Isle Shipyard, Inc.*, 15-257 (La. App. 5 Cir. 10/28/15), 178 So.3d 191, 195-96:

instead puts itself in the sole position to decide the merits of the underlying case *de novo,* by concluding the wrong law was applied by the trial court in determining the claim.

In concluding my thoughts about the credibility of B.N.'s identification of Mr. Alexander, I ask a question alluded to in Justice Crain's dissent in *State v. Jones, supra*: How can a claim of factual innocence stand when there remains a positive identification of the perpetrator by the victim?[6] To that, I add the question of at what point does the sufficiency of a victim's testimony in a criminal matter deteriorate into unreliability in a civil matter? Does context change the nature of facts or the veracity of evidence? The majority does not provide an answer, other than to insinuate that it is possible, provided you can hire an expert to produce a generalized result based on the reading of a cold record.

### The DNA evidence

First and foremost, I find that the particular facts, in this case, stand in stark contrast to other cases where compensation was awarded under La. R.S. 15:572.8.[7]

---

The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. The trier of fact may accept or reject any expert's view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the fact-trier's opinion, such substitution appears warranted by the evidence as a whole. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its broad discretion.

[6] Justice Crain wrote, in part:

Here, where this civil case is pursued after A.H.'s death, her identification of Mr. Jones has never been and cannot now be recanted, nor can she defend it. While perhaps unfortunate, I believe this fact prevents civil recovery for Mr. Jones… Here, I do not believe Mr. Jones can prove by clear and convincing evidence he is factually innocent without A.H. recanting her identification, or at least being able to defend it. Thus, no civil recovery is available. I dissent.

*State v. Jones, supra.*

[7] In his brief, Mr. Alexander references other Louisiana cases in which plaintiffs who had their convictions overturned by DNA evidence were awarded compensation pursuant to La. R.S.15:572.8. It appears from Mr. Alexander's own summary that nearly all of those examples are distinguishable on their facts. Mr. Alexander's brief details instances, for example, where

Counsel for Mr. Alexander asserted in a brief that "DNA testing subsequently proved him innocent and he was exonerated." I believe the average person would take this to mean that a DNA sample, irrefutably left at the scene of a crime by the undisputed perpetrator, excluded all possibility of Mr. Alexander's guilt for the crime of which he was convicted. It also strongly implies that Mr. Alexander was released from prison on the strength of that evidence, which completely exonerated him from any suspicion of guilt. However, a review of the January 30, 2018 Order that vacated Mr. Alexander's conviction confirms neither of the insinuations. The Order itself references only the ineffective assistance of counsel claim. However, the record before us is silent on the specific facts that support the trial court's conclusion. I note that Exhibit D-5 of Mr. Alexander's Petition For Compensation For Wrongful Conviction is a copy of a disbarment recommendation of the Louisiana Attorney Disciplinary Board for Joseph Tosh, who was Mr. Alexander's trial counsel. However, Mr. Alexander's case is not identified among the 60 counts raised therein.

I raise this point only to demonstrate that there is no evidence that DNA evidence was instrumental in connection with his release from prison. As will be discussed below, the sampling of the DNA at issue was not conducted until after Mr. Alexander had filed his claim for compensation.

---

factual innocence was found and compensation granted after: "DNA testing of the rape kit excluded petitioner but did not identify actual perpetrator;" "after DNA testing of seminal fluid found on rape victim's sanitary napkin excluded petitioner but did not identify actual perpetrator;" "after DNA testing of blood on a knife rape victim used to stab the perpetrator excluded petitioner but did not identify actual perpetrator;" "after DNA testing of the rape victim's clothing and bedding excluded the petitioner but did not identify the actual perpetrator" and; "after DNA testing of a blood stain, fingernail scrapings, and semen sample revealed compatible DNA profiles which excluded petitioner but did not identify the actual perpetrator." Mr. Alexander also references a case where a plaintiff was granted compensation "after DNA testing of pubic hair samples recovered from the scene of the rape excluded petitioner but did not identify actual perpetrator."

Against this backdrop, I now review the majority's conclusions regarding the evidence presented in its *de novo* review.

I find merit in First Circuit's observation in *In re Williams*, 07-1380 (La. App. 1 Cir. 2/20/08), 984 So.2d 789, 793-94, that there is a legislative intent behind La. R.S.15:572.8 "that compensation be awarded in cases where factual innocence is established clearly and convincingly through such scientific evidence (e.g., DNA) that exonerates a person, or when another person has confessed to and subsequently been convicted of the crime at issue, and in all other cases when factual innocence is otherwise proven by clear and convincing evidence." As my survey of these types of cases shows, where a certain evidentiary standard is met concerning the first two examples of DNA or identity, recovery for a claimant is more likely.[8] Arguably, the common factor in a successful La. R.S. 15:572.8 claim is that the DNA tested was irrefutably identified and linked to the crime as direct evidence that could only have come from the perpetrator, such as DNA extracted from a rape kit. In those cases, certainty as to the connection and relevance of the evidence provided a result reliable enough to demonstrate that a plaintiff did not commit the crime for which he was convicted. I find, however, that the particular facts, in this case, stand in stark contrast to others where compensation was rightfully awarded.

The DNA evidence, in this case, is identified as "specimen #1," which was described as "an envelope containing an unknown hair sample." The record shows that "specimen #1" was collected by JPSO crime scene technician Deputy Lawrence Morin. At trial, Deputy Morin testified that on November 8, 1979, he took pictures and collected evidence at the scene

---

[8] As noted by Justice Johnson in her concurring opinion in *Jones v. Vannoy*, 17-0101 (La. 6/16/17), 221 So.3d 850, 1–851, "DNA testing has led to numerous exonerations of the wrongly convicted."

where B.N. was assaulted. Among the items he obtained were "hairs from the floor in the bathroom." No additional details regarding the method of collection, the method of preservation, or a description of the samples were provided at trial, nor is there any indication in the record that "specimen #1" was tested in connection with Mr. Alexander's trial in 1980.

Here, the location where "specimen #1" was reportedly obtained, the bathroom in B.N.'s store, is significant to Mr. Alexander's DNA claim. B.N. originally told detectives that the bathroom is where her assailant raped her. In her 2017 interview with the JPDA's Office, B.N. was asked what information she could recall about the bathroom in 1979, including its condition and who may have used it near the time of the rape. B.N. stated that she had thoroughly cleaned the bathroom at an unspecified time after moving into the store space, and that "to her knowledge" the only African American man to be present in the bathroom was the man who attacked her. In her interview by the Louisiana Attorney General's ("LAG") Office on October 16, 2019, B.N. was again questioned about the bathroom and who may have used it in approximately the same time frame of the attack. B.N.'s memory of the incident and investigation were admittedly not clear. She indicated that the assault had occurred in the "back room" or "side room" of the store, and not the "bathroom." She also stated that there was old carpet being stored in the area where the hairs were found and that the bathroom was not "in shape" for someone to go in there at the time. In addition, B.N. acknowledged that the workmen who were renovating her store could have used the bathroom when she was not present in the building. She also said that, although unlikely, it is possible that some of the workmen could have been African American as she was not present to see everyone who was working on her store renovation.

Mr. Alexander asserts that B.N.'s interview of 2017 conclusively establishes that any hair samples recovered by the JPSO in 1979, could only have come from the perpetrator. Specifically, Mr. Alexander reasons that B.N.'s "meticulous" cleaning of her store bathroom precluded the presence of all material on the floor except for that which may have been deposited there at the very time that B.N. was attacked. Mr. Alexander also maintains that the sum of B.N.'s testimony, which he contends is accurate, means that it was impossible for any African American male, aside from the attacker, to have used the bathroom where the samples were found. It is against the background of these two assumptions that Mr. Alexander concludes the hair sample testing, in this case, exonerates him and is irrefutable evidence of his actual innocence.

The majority fully and unequivocally accepts Mr. Alexander's framing of the argument and conclusion in a single sentence, "Upon *de novo* review, we find the best explanation for the DNA test results indicating that the three pubic hairs belonged to an individual other than Mr. Alexander, to be that Mr. Alexander was not the perpetrator of this crime." However, the opinion sets forth a "best guess" without discussing the other options that were considered.

As observed above, in his brief Mr. Alexander references other Louisiana cases in which plaintiffs who had their convictions overturned by DNA evidence were awarded compensation according to La. R.S.15:572.8. It appears from Mr. Alexander's summary that almost all of those examples are distinguishable in their facts. In applying the manifest error standard to the trial court's denial of Mr. Alexander's petition, I observe that this is not a case where DNA extracted from direct evidence of a crime was used to rule out the identity of a person who, without question, had to be the perpetrator.

Here, Mr. Alexander's conviction was not overturned as the result of DNA evidence. While the results of the DNA testing conducted on selected samples of material found at the scene where the rape allegedly took place inarguably did not come from Mr. Alexander, to accept his conclusion of exoneration from that evidence assumes a framework of other unproven facts.

Chief among these assumptions is the premise that the hair evidence collected was relevant. For example, in *State v. Quatrevingt*, 93-1644 (La. 2/28/96), 670 So.2d 197, the Louisiana Supreme Court considered the argument of a defendant convicted of first-degree murder who claimed that, despite other evidence against him, he should have been exonerated based on the presence of an unidentified fiber and single hair. In rejecting this argument, the Court opined:

> While the blue synthetic fiber found on the victim did not appear to match the cotton material of defendant's clothing, this item of evidence alone does not raise a reasonable hypothesis of innocence. Neither does the presence of an unidentified single pubic hair found on a bar of soap in the bathroom shoulder defendant's claim of innocence. Criminalist Dunn testified that, although the single strand of hair did not appear similar to the sample taken from the defendant, the victim or her parents, he was unable to come to the ultimate conclusion that the hair did not belong to either a member of that group or an unknown person. **None of these items of physical evidence are even necessarily connected to the crime, and do not require a finding of a reasonable hypothesis of innocence**.

[Emphasis added.] *Id*., at 201.

In *State v. Johnson*, 07-0475 (La. App. 1 Cir. 10/10/07), 971 So.2d 1124, *writ granted*, 07-2034 (La. 6/6/08), 983 So.2d 907, the defendant was found guilty of second-degree murder and sentenced to life in prison. The defendant later filed an application for post-conviction relief raising two

main claims which included a request for DNA testing.[9] At issue was whether the testing of a victim's fingernail clippings, which did not contain evidence of the defendant's DNA, showed by clear and convincing evidence that the defendant was factually innocent of the crime for which he was convicted. The First Circuit summarized the State's argument as follows:

> The state acknowledges that the DNA test results of the victim's fingernail scrapings excluded the defendant as a donor of that sample. The state points out, however, that during the hearing on this matter, there was expert testimony that DNA from another person could be transferred to the fingernails through contact other than a struggle. The state points out that there was trial testimony that at least one of the children at the victim's home on the night of the instant crime was male. Thus, the state contends the DNA tests results from the victim's fingernail scrapings did not prove by clear and convincing evidence that the defendant was factually innocent of the crime as required by Article 930.3(7).

*Id.*, at 1128. In finding merit in the State's argument, the court reasoned:

> At the defendant's trial, there was testimony that the testing of the victim's fingernail clippings produced negative results, indicating no foreign matter was found on them. However, the DNA in question, found later through more advanced testing, could have been transferred to the victim's fingernails at any time prior to her murder. **The defendant's argument and the court's ruling appear to rely on an assumption for which there is no evidence in the record,** i.e., that the victim struggled or fought with her assailant, thereby acquiring his DNA under her fingernails. **There is no evidence presented to show that the DNA detected on the victim's fingernail scrapings was deposited by the assailant during the attack.**
>
> In the instant case, **the mere detection of DNA from another male on the victim's fingernails, absent any evidence as to how and when the DNA was deposited, does not show by clear and convincing evidence that the defendant was factually innocent of the instant crime.** The mere showing of DNA belonging to an unknown male on the victim's fingernail scrapings

---

[9] The defendant's second claim was that he should be granted a new trial based on the state's failure to disclose exculpatory evidence. In granting the relator's writ, the Supreme Court found that it need not consider the DNA claim raised by the defendant in his initial writ application, as it was moot. It also expressed no opinion concerning the efficacy of the DNA claims of the defendant or the action of the Louisiana First Circuit Court of Appeal. *State v. Johnson*, 09-1920 (La. 10/9/09), 18 So.3d 1268, 1269.

does not exonerate the defendant in the instant case but would "merely muddy the waters." See 1132 *Rivera v. State*, 89 S.W.3d at 59. **There is no showing in the instant case that only the assailant's DNA would have been found under the victim's fingernails, as there are numerous methods in which another male's DNA could have been transferred to the victim's fingernails.**

[Emphasis added.] *Id.*, at 1131.[10]

While *Quatrevingt, supra, and Johnson, supra,* were not considered in the framework of a La. R.S.15:572.8 claim, I nonetheless find the courts' logic in those cases regarding the importance of the context of DNA evidence to be instructive. Stated another way, I believe that the reliability of the hair evidence, in this case, would be better supported if, for example, Mr. Alexander established conclusively that the rape took place in a specific part of the store. Here, the record opens up the possibility through B.N.'s more recent interviews that she was not raped in the bathroom at all. B.N. also claimed in the later interviews that the bathroom area was not fit for use, and was being utilized for the storage of carpet from the record store previously housed there. Without the certainty of the scene of the crime itself, the relevance of any evidence obtained remains a question. I also note that the same interviews of B.N., that Mr. Alexander relies upon to make his claim of factual innocence, opens the possibility, even if remote, of other African-American men using the bathroom during the time the store was being renovated before when the rape occurred.

---

[10] After additional proceedings, the supreme court in that case found the issue of DNA evidence to be moot, as the defendant was granted a new trial on other grounds:

> [t]his court need not consider the DNA claim raised by the defendant in his initial writ application, as it is moot. We pretermit any discussion of defendant's DNA claim, in light of the trial court's July 22, 2009, judgment granting the defendant a new trial based upon his *Brady* claim. As such, this court expresses no opinion concerning the efficacy of the DNA claims of the defendant or the action of the Louisiana First Circuit Court of Appeal.

*State v. Johnson*, 09-1920 (La. 10/9/09), 18 So.3d 1268, 1269

*Untested evidence*

The third factor the majority discusses is the single hair that was untested by Mr. Alexander or the State. Its conclusion, in part, is that given the gravity of the prospect of letting a convicted rapist walk free, the State ought to have tested every piece of evidence with due diligence. This completely ignores the fact that Mr. Alexander's conviction was not based on the irrefutability of DNA evidence, but ineffective assistance of counsel. The reasons why the district attorney chose not to retry Mr. Alexander are beyond this Court's ability to know. But to infer, in any way, that the State had a responsibility to help prove Mr. Alexander's civil case is a direct contradiction of the plain language in La. R.S. 15:572.8, and the tenets of civil law generally.[11] The burden to prove the claim was Mr. Alexander's alone to carry.

The majority opinion is quick to glaze over the term "adverse presumption," and only uses it referencing the State. I believe that a recitation of the principle is relevant here. As explained by Judge Crain's dissent in *BancorpSouth Bank v. Kleinpeter Trace, L.L.C.*, 13-1396 (La. App. 1 Cir. 10/1/14), 155 So.3d 614, 647, *writ denied*, 14-2470 (La. 2/27/15), 159 So.3d 1067:

> As recognized by the majority, a litigant's failure to produce evidence under his control raises an adverse presumption that the evidence would have been detrimental to his case; **however, the presumption is not applicable if the party adequately explains his failure to produce the evidence.** *See Carlson v. Ewing*, 219 La. 961, 977, 54 So.2d 414, 419 (1951); *City of New Orleans v. Gauthreaux*, 32 La. Ann. 1126, 1130

---

[11] As noted by this Court in *Carrier Corp. v. Cousins*, 15-24 (La. App. 5 Cir. 5/14/15), 170 So. 3d 1168, 1171-72:

> In a civil case, Louisiana courts require the plaintiff to fulfill his or her burden to prove a prima facie case. In ordinary civil actions, the plaintiff, in general, has the burden of proof and must prove the facts at issue by a preponderance of the evidence.

(La.1880); *Raines v. Louisiana State Nursing Board*, 12-1831 (La. App. 1 Cir. 6/7/13), 2013 WL 2488130, *writ denied*, 13-2048 (La.11/15/13), 126 So.3d 471; *Paradise v. Al Copeland Investments, Inc.*, 09–0315 (La. App. 1 Cir. 9/14/09), 22 So.3d 1018, 1027. A presumption is "an inference created by legislation that the trier of fact must draw if it finds the existence of the predicate fact unless the trier of fact is persuaded by evidence of the nonexistence of the fact to be inferred." La. Code Evid. art. 302(3) (emphasis added); see also La. Code Evid. art. 305; *Hall v. Folger Coffee Co.*, 03–1734 (La.4/14/04), 874 So.2d 90, 97; *Marroy v. Hertzak*, 11–0403 (La. App. 1 Cir.9/14/11), 77 So.3d 307, 317.

[Emphasis added.] With this principle in mind, and using the same logic as the majority concerning the State, you could rephrase their question to read, "With the recovery of compensation at stake based on a claim of actual innocence, why would Mr. Alexander want to leave any doubt as to whether he was the source of a piece of evidence found in the bathroom?" What is undisputed is that the pubic hair samples tested in this case were done at the direction of Mr. Alexander. The record provides no explanation from Mr. Alexander why he chose to omit the testing of a hair which he contends exonerates him of the crime for which he was convicted. Applying the relevant law in this civil matter results in the presumption that the untested evidence is detrimental to his case.

*An important proceeding*

Finally, I take issue with the majority's diminishment of La. R.S. 15:572.8 claims where "what is at stake is simply monetary compensation from a fund that is specifically designated for persons who have been wrongfully convicted and imprisoned by the State." Undoubtedly, for those who do qualify, there is great importance in receiving the compensation, though the reward surely falls short of making up for the years spent incarcerated. However, as observed by the First Circuit in *In re Williams*, *supra*:

Clearly, the statute requires more than just a showing that a conviction has been overturned or vacated. **Implicitly, it reflects the intent that compensation will not be awardable in every matter in which post conviction relief has been granted**. An applicant must also prove by clear and convincing evidence that he did not commit the crime or any other crime based on the same set of facts.

For the reasons stated above, if it is necessary for the merits of the underlying matter to be decided by this Court upon unilaterally assuming jurisdiction, I find that Mr. Alexander has not shown that he is factually innocent under any applicable standard. With that said, I would rather remand the case to the trial court for reconsideration under the holding in *Jones, supra*. Otherwise, I dissent.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JUNE 21, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_Curtis B. Pursell_

**CURTIS B. PURSELL**
CLERK OF COURT

# 22-CA-12

## E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE MICHAEL P. MENTZ (DISTRICT JUDGE)
CHRISTOPHER N. WALTERS (APPELLEE)     GRANT L. WILLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)
KIA H. HAYES (APPELLANT)

## MAILED

JEE Y. PARK (APPELLANT)
ZACHARY T. CRAWFORD (APPELLANT)
ATTORNEYS AT LAW
INNOCENCE PROJECT NEW ORLEANS
4051 ULLOA STREET
NEW ORLEANS, LA 70119

HONORABLE JEFFREY M. LANDRY
(APPELLEE)
ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
POST OFFICE BOX 94005
BATON ROUGE, LA 70804